* Parsons, C. J.
The plaintiff claims to be a public teacher of piety, religion, and morality, within the third article of the declaration of rights prefixed to the constitution of this commonwealth, but of a sect of Christians different from the inhabitants of the first parish in Falmouth, and publicly instructing several of the said inhabitants, who are of the same sect with himself, who usually attend on his preaching, and who have directed their taxes, paid for supporting public worship in the parish, to be paid over for his support; and he has instituted this suit to recover those taxes of the parish.
_ Not pretending to be the public teacher of any incorporated religious society obliged by law to maintain a public teacher, to maintain the issue on his part, he offered evidence, that in fact he was the teacher of a voluntary society of Universalists, who usually attended on his instruction. This evidence was rejected by the judge, on the ground that no person could maintain this action but a Protestant teacher of piety, religion, and morality, of some incorporated religious society; and to this rejection the plaintiff excepts
*331 The legal effect of evidence of this kind, in cases of this nature, has been often a subject of discussion ; and among judges there have been different opinions. The subject certainly requires a diligent examination, exempt, as far as possible, from the influence of any prepossessions, or preconceived opinions. For this purpose, we shall consider the motives which induced this people to introduce into the constitution a religious establishment, the nature of •the establishment introduced, and the rights and privileges it secured to the people, and to their teachers. If these points shall be clearly and justly explained, it will then be easy to infer the principles by which the present action must be decided.
The object of a free civil government is the promotion and security of the happiness of the citizens. These effects can- - not be produced, but by the knowledge and practice * of [ * 405 ] our moral duties, which comprehend all the social and civil obligations of man to man, and of the citizen to the state. If the civil magistrate in any state could procure by his regulations a uniform practice of these duties, the government of that state would be perfect.
To obtain that perfection, it is not enough for the magistrate to define the rights of the several citizens, as they are related to life, liberty, property, and reputation, and to punish those by whom they may be invaded. Wise laws, made to this end, and faithfully executed, may leave the people strangers to many of the enjoyments of civil and social life, without which their happiness will be extremely imperfect. Human laws cannot oblige to the performance of the duties of imperfect obligation ; as the duties of charity and hospitality, benevolence and good neighborhood; as the duties resulting from the relation of husband and wife, parent and child ; of man to man, as children of a common parent; and of real patriotism, by influencing every citizen to love his country, and to obey all its laws. These are moral duties, flowing from the disposition of the heart, and not subject to the control of human legislation.
Neither can the laws prevent, by temporal punishment, secret offences, committed without witness, to gratify malice, revenge, or any other passion, by assailing the most important and most estimable rights of others. For human tribunals cannot proceed against any crimes, unless ascertained by evidence ; and they are destitute of all power to prevent the commission of offences, unless by the feeble examples exhibited in the punishment of those who may be detected.
Civil government, therefore, availing itself only of its own powers, is extremely defective; and unless it could derive assistance *332 from some superior power, whose laws extend to the temper and disposition of the human heart, and before whom no [ * 406 ] offence is secret, wretched indeed would be the * state of man under a civil constitution of any form.
This most manifest truth has been felt by legislators in all ages; and as man is born, not only a social, but a religious being, so, in the pagan world, false and absurd systems of religion were adopted and patronized by the magistrate, to remedy the defects necessarily existing in a government merely civil.
On these principles, tested by the experience of mankind, and by the reflections of reason, the people of Massachusetts, in the frame of their government, adopted and patronized a religion, which, by its benign and energetic influences, might cooperate with human institutions, to promote and secure the happiness of the citizens, so far as might be consistent with the imperfections of man.
In selecting a religion, the people were not exposed to the hazard of choosing a false and defective religious system. Christianity had long been promulgated, its pretensions and excellences well known, and its divine authority admitted. This religion was found to rest on the basis of immortal truth ; to contain a system of morals adapted to man, in all possible ranks and conditions, situations and circumstances, by conforming to which he would be meliorated and improved in all the relations of human life ; and to furnish the most efficacious sanctions, by bringing to light a future state of retribution. And this religion, as understood by Protestants, tending, by its effects, to make every man submitting to its influence, a better husband, parent, child, neighbor, citizen, and magistrate, was by the people established as a fundamental and essential part of their constitution.
The manner in which this establishment was made, is liberal, and consistent with the rights of conscience on religious subjects. As religious opinions, and the time and manner of expressing the homage due to the Governor of the universe, are points depending on the sincerity and belief of each individual, and do [ * 407 ] not concern the public * interest, care is taken, in the second article of the declaration of rights, to guard these points from the interference of the civil magistrate; and no man can be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agree-bale to the dictates of his own conscience, or for his religious profession or sentiment, provided he does not disturb the public peace, or obstruct others in their religious worship ; in which case he is punished, not for his religious opinions or worship, but because *333 he interrupts others in the enjoyment of the rights he claims for himself, or because he has broken the public peace.
Having secured liberty of conscience, on the subject of religious opinion and worship, for every man, whether Protestant or Catholic, Jew, Mahometan, or Pagan, the constitution then provides for the public teaching of the precepts and maxims of the religion, of Protestant Christians to all the people. And for this purpose it is made the right and the duty of all corporate religious societies, to elect and support a public Protestant teacher of piety, religion, and morality; and the election and support of the teacher depend exclusively on the will of a majority of each society incorporated for those purposes. As public instruction requires persons who may be taught, every citizen may be enjoined to attend on some one of these teachers, at times and seasons to be stated by law, if there be any on whose instructions he can conscientiously attend.
In the election and support of a teacher, every member of the corporation is bound by the will of the majority ; but as the great object of this provision was to secure the election and support of public Protestant teachers by corporate societies, and as some members of any corporation might be of a sect or denomination of Protestant Christians different from the majority of the members, and might choose to unite with other Protestant Christians of their own sect or denomination, in maintaining a public teacher, who by law was entitled to support, and on whose * in- [ * 408 ] structions they usually attended, indulgence was granted, that persons thus situated might have the money they contributed to the support of public worship, and of the public teachers aforesaid, appropriated to the support of the teacher on whose instructions they should attend.
Several objections have at times been made to this establishment, which may be reduced to three: that when a man disapproves of any religion, or of any supported doctrines of any religion, to compel him by law to contribute money for public instruction in such religion or doctrine, is an infraction of his liberty of conscience; that to compel a man to pay for public religious instructions, on which he does not attend, and from which he can therefore derive no benefit, is unreasonable and intolerant; and that it is anti-christian for any state to avail itself of the precepts and maxims of Christianity, to support civil government, because the Founder of it has declared that his kingdom is not of this world.
These objections go to the authority of the people to make this constitution, which is not proper nor competent for us to bring into question. And although we are not able, and have no inclination, to assume the character of theologians, yet it may not be improper *334 to make a few short observations, to defend our constitution from the charges of persecution, intolerance, and impiety.
When it is remembered that no man is compellable to attend on any religious instruction, which he conscientiously disapproves, and that he is absolutely protected in the most perfect freedom of conscience in his religious opinions and worship, the first objection seems to mistake a man’s conscience for his money, and to deny the state a right of levying and of appropriating the money of the citizens, at the will of the legislature, in which they all are represented. But as every citizen derives the security of his property, and the fruits of his industry, from the power of the state, so, as the price of this protection, he is bound to contribute, in common with [ * 409 ] his fellow-citizens, *for the public use, so much of his property, and for such public uses, as the state shall direct. And if any individual can lawfully withhold his contribution, because he dislikes the appropriation, the authority of the state to levy taxes would be annihilated ; and without money it would soon cease to have any authority. But all moneys raised and appropriated for public uses, by any corporation, pursuant to powers derived from the state, are raised and appropriated substantially by the authority of the state. And the people, in their constitution, instead of devolving the support of public teachers on the corporations, by whom they should be elected, might have directed their support to be defrayed out of the public treasury, to be reimbursed by the levying and collection of state taxes. And against this mode of support, the objection of an individual, disapproving of the object of the public taxes, would have the same weight it can have against the mode of public support through the medium of corporate taxation. In either case, it can have no weight to maintain a charge of persecution for conscience’ sake. The great error lies in not distinguishing between liberty of conscience in religious opinions and worship, and the right of appropriating money by the state. The former is an unalienable right; the latter is surrendered to the state, as the price of protection.
The second objection is, that it is intolerant to compel a man to pay for religious instruction, from which, as he does not hear it, he can derive no .benefit. This objection is founded wholly in mistake. The object of public religious instruction is to teach, and to enforce by suitable arguments, the practice of a system of correct morals among the people, and to form and cultivate reasonable and just habits and manners ; by which every man’s person and property are protected from outrage, and his personal and social enjoyments promoted and multiplied. From these effects every man derives the most important benefits; and whether he be, or be *335 not, an auditor of any public * teacher, he receives [*4101 more solid and permanent advantages from this public instruction, than the administration of justice in courts of law can give him. The like objection may be made by any man to the support of public schools, if he have no family who attend ; and any man, who has no lawsuit, may object to the support of judges and jurors on the same ground ; when, if there were no courts of law’, he would unfortunately find that .causes for law'suits would sufficiently abound.
The last objection is founded upon the supposed antichristian conduct of the state, in availing itself of the precepts and maxims of Christianity, for the purposes of a more excellent civil government. It is admitted that the Founder of this religion did not intend to erect a temporal dominion, agreeably to the prejudices of his countrymen; but to reign in the hearts of men, by subduing their irregular appetites and propensities, and by moulding their passions to the noblest purposes. And it is one great excellence of his religion, that, not pretending to worldly pomp and power, it is calculated and accommodated to meliorate the conduct and condition of man, under any form of civil government.
The objection goes further, and complains that Christianity is not left, for its promulgation and support, to the means designed by its Author, who requires not the assistance of man to effect his purposes and intentions. Our constitution certainly provides for the punishment of many breaches of the laws of Christianity, not for the purpose of propping up the Christian religion, but because those breaches are offences against the laws of the state ; and it is a civil, as well as a religious duty of the magistrate, not to bear the sword in vain. But there are many precepts of Christianity, of which the violation cannot be punished by human laws; and as obedience to them is beneficial to civil society, the state has wisely taken care that they should be taught, and also enforced by explaining their moral and religious sanctions, as they cannot be enforced by temporal * punishments. And from the genius [ * 411 ] and temper of this religion, and from the benevolent character of its Author, we must conclude that it is his intention that man should be benefited by it in his civil and political relations, as well as in his individual capacity. And it remains for the objector to prove, that the patronage of Christianity by the civil magistrate, induced by the tendency of its precepts to form good citizens, is not one of the means by which the knowledge of its doctrines was intended to be disseminated and preserved among the human race.
The last branch of the objection rests on the very correct position that the faith and precepts of the Christiai religion are so inter- *336 woven, that they must be taught together; whence it is inferred that the state, by enjoining instruction in its precepts, interferes with its doctrines, and assumes a power not intrusted to any human authority.
If the state claimed the absurd power of directing or controlling the faith of its citizens, there might be some ground for the objection. But no such power is claimed. The authority derived from the constitution extends no further than to submit to the understandings of the people the evidence of truths deemed of public utility, leaving the weight of the evidence, and the tendency of those truths, to the conscience of every man.
Indeed, this objection must come from a willing objector ; for it extends, in its consequences, to prohibit the state from providing for public instruction in many branches of useful knowledge which naturally tend to defeat the arguments of infidelity, to illustrate the doctrines of the Christian religion, and to confirm the faith of its professors.
As Christianity has the promise not only of this, but of a future life, it cannot be denied that public instruction in piety, religion, and morality, by Protestant teachers, may have a beneficial effect beyond the present state of existence. And the people are to be applauded, as well for their benevolence as for their wisdom, that, in selecting a religion whose precepts and sanctions [*412] might supply the * defects in civil government, necessarily limited in its power, and supported only by temporal penalties, they adopted a religion founded in truth; which in its tendency will protect our property here, and may secure to us an inheritance in another and a better country.
These objections to our constitution cannot be made by the plaintiff, who, having sought his remedy by an action at law, must support it as resting on our religious establishment, or his claim can have no legal foundation.
The last point for our consideration is, whether this establishment, according to the true intent and design of its provisions, will, or will not, enable the plaintiff to maintain his claim to the money he demands.
The objection against his claim is substantially this: that the constitution has not provided in any way for the legal support of any teacher of piety, religion, and morality, unless he be a public Protestant teacher of some incorporated religious society. It is admitted by the parties, that the plaintiff is a Protestant teacher of a voluntary society not incorporated, and which is under ho legal obligation to elect or support a teacher; that he and his hearers are of a denomination of Christians different from that of the *337 inhabitants of the first parish in Falmouth; and all other facts, necessary to support the action, may be presumed.
After a consideration of these facts, we are all of opinion that the constitution has not authorized any teacher to recover, by action at law, any money assessed pursuant to the third article of the declaration of rights, but a public Protestant teacher of some legally incorporated society; and that the objection must prevail. The societies, who may be enjoined to elect and support teachers of this description, are described as “ towns, parishes, precincts, or other bodies politic, or religious societies,” which last expression is merely explanatory of the words, “ bodies politic,” and confines them to bodies politic incorporated to act as religious societies.
If we are to consider the words * “religious societies” [ *413 ] as descriptive of a class of societies not included in the words “ bodies politic,” the consequence would be, that all bodies politic, for whatever purposes incorporated, would be obliged to elect and maintain a teacher of religion — a consequence too absurd to be admitted. Indeed, the words “ religious societies ” must, from the nature of the duty imposed on them, necessarily mean societies having corporate powers; because, without those powers, the duty cannot be legally performed, a voluntary association having no legal authority to assess money on all the members, or to compel payment, or to elect a teacher by a vote of the greater part.
The plaintiff’s claim is endeavored to be supported by the fourth paragraph of the third article, in which it is declared that “ all moneys paid by the subject to the support of public worship, and of the public teachers aforesaid, shall, if he require it, be uniformly applied to the support of the teacher of his own religious denomination, on whose instruction he attends.” And it is contended, that in this paragraph two descriptions of teachers are in eluded — the first referring to the teachers of incorporated societies provided for in the first paragraph, and the latter embracing teachers of any voluntary society, who, in fact, have a teacher, although not obliged to elect and support one. We are, however, satisfied, tho’ in every part of the third article, but one class of public teachers is contemplated, and which is particularly described in the first paragraph ; and that, whenever teachers are mentioned, such teachers alone are intended, who by law are entitled to support. For, although the constitution contemplates different denominations of Protestant Christians, yet no religious societies are referred to, unless incorporated ; and no teachers are mentioned as existing, who are not entitled to a maintenance.
If the construction which was contended for was right, then a Roman Catholic teacher might maintain an action similar *338 to the plaintiff’s. But in the case of Matignon vs [ * 414 ] * The Inhabitants of Newcastle, in the county of Lincoln, decided some years since by this Court in Suffolk, it was determined, that the teacher mentioned in the latter part of the fourth paragraph so far referred to the first paragraph, as that he must be a Protestant teacher. And if a reference must be made to any part of the description, we know not why it must not be made to the whole of it, as the a.r ' .'V has drawn no line of distinction.
In the latter part of this fourth paragraph, the teachers to whom the money may be applied, are describee is public teachers. But a public teacher must be a teacher of some public, and not of any private religious society. And what society must be deemed a public society, is certainly a question of law, whether it be settled by a judge or by a jury. When, therefore, the facts, describing the nature or circumstances of any society, are established by evidence, from those facts the law must conclude whether the society be, in legal contemplation, public or private. Now, if the society be not incorporated, what rules are prescribed by law, by whicli its character may be defined ? Does it depend on the number of the associates, or on the notoriety of the association ? If on the former, what number is sufficient? If on the latter, what degree of notoriety is necessary ? On these points the law is silent. But there is a legal principle applicable to this subject, and which can at all times be applied with certainty. A public society is a society known in law, formed by the public authority of the state ; and a private society is formed by the voluntary association of private persons, the powers of which are derived from the individual consent of each member.
To admit the plaintiff’s construction, would render the first paragraph unreasonable and unjust. By that paragraph, a corporate religious society is obliged to support a public teacher; but by his construction, the means of support may be taken from it, without any fault on its own part. Any number of mem[*415] bers, whether five or five hundred, * (for a voluntary-society may consist of any number, large or small,) may associate together, assume the denomination of Protestant Christians, and at their own pleasure withdraw their assistance from the corporation whose duty remains, by engaging a teacher upon any or no terms, and whom they are not obliged by law to maintain.
By this last paragraph, a reasonable indulgence is in particular cases granted. When there are ■'cochers of two incorporated religious societies of different denom.natic is, a member of one, who *339 is of the sect and worships with the other, may direct his parish tax to be paid to the teacher on whose instructions he attends. This can be attended with little inconvenience, as both the teachers are entitled by law to a support, and the exchange of hearers may be mutual.
But to extend this indulgence to a teacher of an unincorporated society, who is entitled to no support, would be to grant him a remedy where he has no right, and to encourage disaffection and divisions in regular parishes, thereby also lessening or defeating the means they have of supporting a public teacher, to which they are obliged by this very article.
Again, it is asked, What relief can a few conscientious men have, who are of a religious sect, different from that of the parish in which they live, and have no teacher of any corporate society in their neighborhood, of their own sect or denomination, on whose instructions they can conscientiously attend ?
The rights of conscience, in matters of religious opinion and worship, are protected by the second article; and by the third article, they are not obliged to attend on the instructions of any teacher, whom they cannot conscientiously hear. The inconvenience, therefore, is merely pecuniary, and of no great magnitude. In this case, they ought, as good citizens, to submit to those laws, from which they derive protection for their persons and property, and which must regulate the disposition of all assessments made * by their authority. When their numbers [*416] are large, and they are able and willing to submit to the obligation of electing and supporting a public teacher, the liberality of the legislature will grant them relief, by vesting them with corporate powers ; when, in consequence of those powers, other corporations will not be disabled from discharging the duties already imposed on them by law. And it seems a mistake to suppose that the legislature cannot grant any further relief in particular cases, which in its discretion it may consider as deserving relief. Quakers are not provided for by the third article, because they have no teacher, and they resist the payment of any ministerial taxes. But they were exempted from ministerial assessments by the provisions of a provincial statute now expired ; and those provisions are reenacted by the statute of 1799, c. 87.
But the object of the constitution was to settle general principles and to secure general rights, and not to legislate in all cases. If particular cases should arise, which might claim relief, consistently with the constitution, those cases were left to the discretion of the legislature, to whom the interests of the citizens are intrusted.
The last paragraph of the third article has also been pressed *340 upon us. It provides that “ every denomination of Christians, demeaning themselves peaceably, and as good subjects of the commonwealth, shall be equally under the protection of law ; and no subordination of one sect or denomination to another shall ever be established by law.”
In our opinion, this paragraph has no relation to the subject before us Its object was to prevent any hierarchy, or ecclesiastical jurisdiction of one sect of Christians over any other sect; and the sect of Roman Catholics are as fully entitled to the benefit of this clause, as any society of Protestant Christians. It was also intended to prevent any religious test, as a qualification for office. Therefore those Catholics, who renounce all obedience and subjection to the pope, as a foreign prince or prelate, may, [*417] notwithstanding * their religious tenets, hold any civil office, although the constitution has not provided for the support of any public teacher of the Popish religion.
If this paragraph can be considered as relating to the provision for public teachers, a Catholic teacher of a Catholic congregation might maintain an action to recover the parish taxes of his hearers, as well as a public Protestant teacher of any incorporated religious society.
The only inferiority, created by the third article, is founded on a social principle, essential to the existence of any society, — the submission of the minority to the majority. This submission is required, without any regard to sects or denominations of Christians. In the present case, if the plaintiff was of the same sect as the inhabitants of the first parish in Falmouth, and they were of the denomination to which he belongs, the law would be precisely the same.
This construction, which we find ourselves obliged to give to the constitution on this subject, is agreeable to the construction adopted by the legislature, as expressed in the statute of 1799, c. 87, before cited. Thus all citizens, except Quakers, are obliged to contribute to the support of public teachers ; and when any member of any society, but of a different sect, shall request to have his taxes paid to the teacher of his own sect, but of another society, his request cannot prevail, but on his producing a certificate signed by his public teacher, and by a committee of the society, purporting in substance such facts as entitle him to the obtaining of his request; and the assessors of the society in which he dwells may afterwards omit him in their assessments.
This construction is not denied ; but it is argued that the legisature cannot, by any construction, control the constitution. This s true ; but where any part of the constitution is of doubtful con *341 struction, the opinion of the legislature deserves to be heard, and is entitled to due consideration. And in the present case, their construction * appears to us to be correct. Cer- [*418] tainly no conclusion can be drawn from it, that the statute intended to exempt any citizen, except Quakers, from contributing to the support of some public Protestant teacher.
It is our opinion that the verdict do stand, and that judgment be rendered upon it.