THE FRANKLIN STREET SOCIETY *v.* MANCHESTER.

The constitution of New Hampshire does not exempt church property from taxation.

APPEAL from the refusal of tax assessors to abate a tax assessed in 1880 against the plaintiff, a religious society, upon the value above $10,000 of its real estate used exclusively for a place of worship.

*Cross,* for the plaintiff.   The law of 1879, taxing church property, is unconstitutional.

I. Because it violates the fundamental principles of art. 6 of the bill of rights in its letter and spirit, and as interpreted by the laws and usages of the state.   Until the passage of this law no state or government has taxed church property, and what has been done for more than one hundred years throughout the length and breadth of the land, by men of all parties and creeds, ought to be regarded as a fair interpretation of the fundamental principles of our government.   The men who established our form of government believed and declared that the building of houses of public worship and the support of the ministry were as essential to the security and support of the state, as the building of school-houses and the support of teachers of common schools, or the' maintenance of courts and legislatures.   The church or religious society was regarded as an essential part of the state.   Ideas as to forms of worship and as to creeds have been modified, but the principles as embodied in our constitutions and laws relating to " the public worship of the Deity, and of public instruction in morality and religion, have not changed.   Bancroft Hist. U. S., vol. 4, *p.* 149; Palfrey Hist. N. E.; Sanborn Hist. N. H. 243; Belknap Hist.

N. H., vol. 3, *p.* 344; *Baptist Society* v. *Wilton*, 2 N. H. 510, 512; *Muzzy* v. *Wilkins*, Smith's Rep. (N. H.) 35.

Art. 6 of the bill of rights, as adopted by the people in the constitution in 1784, 1792, and 1876, empowers the legislature "to authorize, from time to time, the several towns, parishes, bodies corporate, or religious societies within this state to make adequate provision, at their own expense, for the support and maintenance of public Protestant teachers of piety, religion, and morality." No change has been made in this part of the constitution for one hundred years. Until 1819 towns had two functions, municipal and parochial, and the legislation of the state and the history of the towns show that the parochial was not of less importance than the municipal. By the act of 1791 towns might, "agreeably to the constitution, grant and vote such sum or sums of money as they shall judge necessary for the settlement, maintenance, and support of the ministry, schools, meeting-houses, school-houses, &c.," putting the support of religious societies on the same footing as ordinary municipal expenditures. What was known as the "toleration act" of 1819 provided that "each religious sect or denomination of Christians in this state may associate and form societies, may admit members, may establish rules and by-laws for their regulation and government, and shall have all the corporate powers which may be necessary to assess and raise money upon the polls and ratable estate of the members of such associations, and to collect and appropriate the same for the purpose of building and repairing houses of public worship, and for the support of the ministry." No material change was made in the act of 1823. The act of 1827 provided that religious societies might be formed, assume a name, and be constituted and become bodies corporate, "and by such name so assumed shall have perpetual succession, and may possess and enjoy all the privileges and immunities and shall be subject to all the liabilities incident to corporations of a similar nature." This was reënacted in substantially the same language in the Revised Statutes of 1842, and appears the same in the Compiled Statutes. In the General Statutes of 1867, the act relating to religious societies reads, "Such society shall possess the powers and be subject to the duties incident to corporations of a similar nature." In the General Laws of 1878 the language is the same as in the General Statutes.

From an examination of the 6th article of the bill of rights, and of the laws and usages from the first settlement of the state until the law of 1879, it is evident that the meeting-house has been considered, like the school-house, necessary for the protection and support of good government. At first the town, having two duties, municipal and parochial, supported the ministry and built houses of worship by general taxation. After 1819 the town separated its municipal from its parochial duties. The town surrendered the meeting-house to the society, and the society was

authorized to impose and collect taxes for its support in place of the town. The town financially was the gainer by this change. A less number of the people were paying the taxes for the support of the ministry than before. The religious society became an important part of the town, although acting independently, and assumed the burden which had been borne by the town. To aid, to encourage, to grant "privileges and immunities" to such societies, was interwoven with all the theory of good government. We submit, therefore, that until the state shall strike art. 6 from the bill of rights, taking in connection with it what we know of the underlying thought and principles of this state as well as the rest of New England, the legislature has no constitutional right to pass a law imposing taxes upon the meeting-houses used as places of public worship.

II. The law taxing houses of public worship is a violation of sec. 10, art. 1 of the constitution of the United States, which declares that "No state shall pass any law impairing the obligation of contracts."

This society was organized and the house built before 1850. Improvements have been since made, but nothing to affect the principle of law. If the legislature had granted a special charter, in which it was declared that this society or the house of public worship to be built should be exempt from taxation, there is no doubt but this would be a contract and within the provision of sec. 10 above referred to. Or if the law of 1827, the chapters in the Revised, Compiled, and other statutes referred to in relation to the incorporation of religious societies, had clearly expressed in words that all such societies shall be exempt from taxation, there is no doubt that this would be a contract between the state and the societies organizing under it. That the legislature has the power to make such a contract, and when made and accepted it became one of the franchises of the corporation, of which it could not be deprived, is too well settled to require citation of numerous authorities. See Cool. Const. Lim. 279–281, and authorities there cited. Cool. Tax. 55; *Piqua Bank v. Knoop,* 16 How. 369; *Dodge v. Woolsey,* 18 How. 331, 339; *Home of the Friendless v. Rouse,* 8 Wall. 439; *Dartmouth College v. Woodward,* 4 Wheat. 518. The bill of rights and *c.* 144 of the Revised Statutes, which gave religious societies "all the powers, privileges, and immunities" incident to corporations of a similar nature, and under which the plaintiff society was organized, made a contract with the plaintiff, one feature of which was that its property should be exempt from taxation. The law of 1879 authorizing such taxation is a violation of that contract, and is unconstitutional.

III. The law authorizes unequal taxation. The exemption of church property to the amount of $10,000 is invidious, unreasonable, and disproportionate, in that it gives freedom from taxation to religious societies in nearly all the towns in the state, while it

authorizes the taxation of like property in the cities and large towns. Unequal taxation is a violation of the 5th and 6th articles of the second part of the constitution, which require all taxes to be proportional and reasonable.

*Patten*, for the defendants. The power of taxation is an essential attribute of sovereignty, and the mode of exercising it is vested in the legislature by constitutional enactment. Art. 28, Bill of Rights. The relinquishment of this power is never to be presumed. *Brewster* v. *Hough*, 10 N. H. 138; *Providence Bank* v. *Billings*, 4 Pet. 561; *North Missouri Railroad* v. *Maguire*, 20 Wall. 61; *Erie Railway Co.* v. *Pennsylvania*, 21 Wall. 492; Cool. Tax. 54, *n*. 2; Burr. Tax. 114; Sedg. Stat. Law 599. The language of art. 6 of the bill of rights shows no intention on the part of its framers to exempt church property from taxation, and does not in fact relate, in any sense, to the subject of taxation. There was no contract in the statutes exempting church property from taxation between the state and the plaintiff, and the latter could have no vested interest in such exemptions, nor the right to their continuance. They were gratuities which any subsequent legislature might revoke. *Brainard* v. *Colchester*, 31 Conn. 409; *Ball* v. *Conroe*, 13 Wis. 233; *Fletcher* v. *Peck*, 6 Cranch 87; *Railway Co.* v. *Supervisors*, 93 U. S. 595; Cool. Tax. 145. The plaintiff is in no position to complain of an exemption of $10,000 of its property.

*Wm. Little*, on the same side. If churches are not taxed, persons not members of religious societies are compelled to pay, in addition to their own tax, a proportionate tax to the societies; and this is contrary to the provision of art. 6 of the bill of rights, which declares that "no person of any one particular religious sect or denomination shall ever be compelled to pay toward the support of the teacher or teachers of another persuasion, sect, or denomination." Not to tax church societies relieves them of their just share of the public burden, and releases them from earning the protection which they enjoy without paying for it. The toleration act of 1819 relieved the people of the direct tax to support religious societies, and the legislature has the power, by taxing church property in whole or in part, to relieve the people of the indirect tax.

*C. R. Morrison*, in reply to the plaintiff's third point. The tax authorized by the law of 1879 is not invidious nor unequal. The plaintiff by that law enjoys an equal exemption with, if not greater than, other church societies, many of which are too poor to maintain religious worship without assistance.

The right of the legislature to make a partial exemption rests upon the same basis as its right to make a total exemption. Every exemption is an indirect tax upon other property, and can only be justified where a direct tax upon other property in its behalf would

be within the power of the legislature. The theory upon which our state acted so long was, that it could impose a direct tax for the building of churches and the support of the ministry. The direct tax was given up as long ago as the toleration act. The indirect tax has been continued. They both stand upon the same footing. I do not doubt the power of the legislature in respect to the indirect tax, for I do not doubt its power to impose the direct tax. It comes from those provisions of our constitution that declare the importance of the maintenance of the public worship of the Deity, and require and provide for the administering of oaths to officers of almost every grade, and to witnesses. This being required, the legislature may, if it sees fit, by aiding in the building of churches, provide means for such instruction of the people as will enable them to understand the nature of the oath which is required of them. But how far the legislature shall go in this direction is a mere question of expediency in view of all the difficulties. It may, if it sees fit, afford only partial aid by a direct tax. It is not obliged to incur the whole expense, or none. For the same reason it is not compelled to grant a total exemption, or none. It is a mere question of what upon the whole will most promote the public weal. If it deems it best to exempt churches of moderate cost, prudently and economically built, it can do so. If it chooses to discourage what it may deem too great a tendency to show and extravagance and luxury, or the accumulation of large property in ecclesiastical corporations, it may tax, as it has, the value in excess of such sum as it deems it advisable to exempt. The alternative of taxing all church property or none should not be compelled.

ALLEN, J. Chapter 50 of the Laws of 1879 provides that "all property, whether real or personal, owned by any church association or corporation, used exclusively for a place of worship, not exceeding ten thousand dollars in value, shall be exempt from taxation; and all such associations or corporations owning church property, whether real or personal, in excess of ten thousand dollars in value, shall be taxed at the same rates as other property for the total valuation of such excess." Under this act the plaintiff society was taxed in 1880 for the excess over ten thousand dollars in value of its house of worship. It now seeks an abatement of the tax on the ground of the unconstitutionality of the law under which the assessment was made.

The power of taxation, as a part of the supreme power of the state, is recognized and defined in the constitution. "Every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property. He is therefore bound to contribute his share in the expense of such protection, and to yield his personal service when necessary, or an equivalent." Bill of Rights, art. 12.

"Full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions, either with penalties or without, so as the same be not repugnant or contrary to this constitution, as they may judge for the benefit and welfare of this state, and for the governing and ordering thereof, and of the subjects of the same, for the necessary support and defence of the government thereof; * * * and to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of and residents within the state, and upon all estates within the same." Const., art. 5. "And while the public charges of government, or any part thereof, shall be assessed on polls and estates in the manner that has heretofore been practised, in order that such assessments may be made with equality there shall be a valuation of the estates within the state, taken anew once in every five years at least, and as much oftener as the general court shall order." Const., art. 6. In these provisions the framers of the constitution not only recognize the necessity of the sovereign power of taxation in the state, but lodged that power in the representative body of the people, and limited it to reasonably equal and proportional assessments upon all the inhabitants and all the estates within the state. The supreme power existing, it was left to be exercised in as full and free a manner as was consistent with the grant, limited only to equality and proportion in assessment. *Opinion of the Justices*, 4 N. H. 565. No exclusion of any individuals, classes, or property of any kind was made ; but it was explicitly set forth, that "every member of the community" "is bound to contribute his share," and that the legislature had "full power and authority" to impose the "proportional and reasonable assessments" upon "all the inhabitants and residents" and "all the estates" within the state. Under such a grant of power every species of property within the state is taxable. So far as exercising the mere power to tax is in question, even public property, whether of the state or municipality, falls under it,—although, from the nature of things, and by necessary implication, such property is exempt from taxes, which, if imposed, would render necessary an increase in the public burden equal to the imposition.

The public worship of God and public instruction in morality and religion were recognized in the bill of rights in the constitution as "giving the best and greatest security to government;" and to promote these, the legislature is empowered "to authorize, from time to time, the several towns, parishes, bodies corporate, or religious societies within this state to make adequate provision at their own expense for the support of public Protestant teachers of piety, religion, and morality." Bill of Rights, art. 6. Prior to and at the time of the adoption of the constitution of 1784 and 1792, public religious worship was very generally supported by a tax laid

by the several towns.   The town was the parish or religious society, which, by authority of legislative acts, furnished the meeting-house, and contracted with and paid the minister.   The provincial statute of 1714 empowered towns to choose ministers and raise money by tax for their support, subject to the right and liberty of conscience.   The same power, of enabling towns to support public worship by means of a tax, was fully set forth in s. 10 of the act of February 8, 1791, entitled "An act for regulating towns and the choice of town officers," and which provided that the legal voters, at any regular meeting of the town, might, agreeably to the constitution, "grant and vote such sum or sums of money as they should judge necessary for the settlement, maintenance, and support of the ministry, schools, meeting-houses, the maintenance of the poor, for laying out and repairing highways, for building and repairing bridges, and for all the necessary charges arising within the said town, to be assessed on the polls and estates in the same town as the law directs."   The support of the ministry and of houses of public worship was then on the same footing as that of schools, highways, and the support of the poor.   With a gradual change arising from the multiplying of religious sects and the larger exercise of freedom of opinion, the system of supporting religious worship through the parochial functions of towns was by degrees abandoned, though authorized by law, until the act of 1819 repealed s. 10 of the act of 1791, and empowered religious societies of every Christian sect "to raise money by taxes upon the polls and ratable estate of the members" for maintaining houses of public worship and supporting the ministry.   By the act of July, 1827, entitled "An act empowering religious associations to assume and exercise corporate powers," religious societies, regularly organized, with a name, clerk, records, and public notice, were granted full corporate powers, with the right of perpetual succession, and the enjoyment of all privileges and immunities, and the subjection to all liabilities, incident to corporations of a similar nature.

After the act of 1819, the town no longer, by tax, built the meeting-house or supported the minister, except in the performance of some contract before made.   The religious society was, or might be, the parish, but the town was no longer the parish or the society. The legislature, acting under the authority and carrying out the provisions of art. 6 of the bill of rights, empowered the religious societies to support religious worship by taxation of their members, but did not empower towns to do so; nor has it ever done so since.   Giving to words their natural and ordinary signification, and gathering the intent of the framers of the constitution and of the people who adopted it from the instrument itself, no language appears restraining the the legislature from taxing property devoted to the uses of public worship.   That every member of the community should contribute his share of the expense of that protection to life, liberty, and property which the bill of rights guarantees, is not a state-

ment of the right of any person, or of any property, to exemption from taxation. The power of the legislature "to levy and impose proportional and reasonable assessments, rates, and taxes upon all the inhabitants and residents within the state and upon all the estates within the same," cannot mean a restriction of the legislative power to a part of the "inhabitants and residents" and a part of the "estates" or property within the state. The language is too plain and explicit to need the aid of construction, and too certain to require extrinsic evidence of the intent of those who used it. The 6th article of the bill of rights, empowering the legislature to authorize towns to tax themselves for the support of public religious worship, contains no hint of exempting church property from taxation, and no language from which an intention to exempt it can be inferred. So long as towns, under the act of 1791, exercised parochial functions, and raised taxes for supporting and maintaining houses of public worship, those places of worship were exempt from taxation as public property by the nature of things, and not by the constitution or by statute. After the act of 1819, when towns were no longer subject to church rates, and the whole management of public worship, including its support, was left to the religious societies authorized and organized for that purpose, the natural reason for exempting this property from taxation ceased. The custom of treating it as free from any public burden continued, though houses of public worship were not named among tax-freed property, nor enumerated in any list of ratable property in any statute, until 1842, when, by the Revised Statutes, meeting-houses were exempted by name from taxation. The same exemption is found in the General Statutes of 1867, and in the General Laws of 1878.

The argument from the long continued custom of exempting property devoted to public religious worship from taxation, as a practical construction of the constitution, would have weight, if the question whether the exemption was enjoyed as a constitutional right, or a legislative privilege subject to repeal, had, till now, been considered. So long as the privilege was enjoyed, the question of holding it by right or by grace was not thought of. The express exemptions by statute, since 1842, show that the legislature may have supposed that meeting-houses were taxable property, unless exempted by express statute. Besides, where the language of the constitution, as in this case, is unambiguous, to suffer a practical construction to prevail would be to defeat the manifest intention of the people who framed its provisions. Story Const., s. 407 ; Cool. Const. Lim. 84 ; *Evans* v. *Myers*, 25 Penn. St. 116 ; *Barnes* v. *First Parish in Falmouth*, 6 Mass. 417 ; *United States* v. *Union Pacific R. R.*, 91 U. S. 72. An exemption not founded on a grant in the constitution, or on any contract in any charter or legislative act, is not prescriptively established by enjoyment, however long continued. No prescription runs against the sovereign, nor does the

state, by omission to use, waive or lose the right to exercise its supreme power, and the citizen can have no vested right in the continuance of any statute of general exemptions. *Com.* v. *Bird,* 12 Mass. 443; *Bragg* v. *People,* 78 Ill. 328; *Moore* v. *Cass,* 10 Kan. 288; *Murphy* v. *People,* 37 Ill. 447; *State* v. *Miller,* 2 Blackf. 35; *State* v. *Quimby,* 51 Me. 395; *State* v. *Wright,* 53 Me. 328; *People* v. *Roper,* 35 N. Y. 629; *Christ's Church* v. *Philadelphia,* 24 How. 300; *Salt Co.* v. *E. Saginaw,* 13 Wall. 373.

The plaintiff claims the right to exemption from the tax and consequent abatement, on the ground that the right of exemption rests in a contract, either in the constitution or in subsequent legislation, or in both, and is inviolate by the constitution of the United States. An agreement by a state, for a consideration received or supposed to be received, that certain property rights or franchises shall be exempt from taxation, is a contract protected by the provision of the federal constitution forbidding a state to pass any law impairing the obligation of contracts. *New Jersey* v. *Wilson,* 7 Cr. 164; *Gordon* v. *Appeal Tax Court,* 3 How. 133; *Piqua Bank* v. *Knoop,* 16 How. 369; *Home of the Friendless* v. *Rouse,* 8 Wall. 430; *Hardy* v. *Waltham,* 7 Pick. 108; *Atwater* v. *Woodbridge,* 6 Conn. 223; *Osborne* v. *Humphrey,* 7 Conn. 335; *Armington* v. *Barnet,* 15 Vt. 751; 58 N. H. 623; Cool. Const. Lim. 342, 343. But to give a law of general exemption from taxation the character of an irrepealable contract, there must be a consideration; for an exemption, made as a privilege merely, may be revoked at any time (*Christ's Church* v. *Philadelphia, supra,* and *Brainard* v. *Colchester,* 31 Conn. 410); and the intention to relinquish the sovereign prerogative of taxation must be distinctly manifested. *Providence Bank* v. *Billings,* 4 Pet. 561; *Herrick* v. *Randolph,* 13 Vt. 531; *People* v. *Com. of Taxes,* 47 N. Y. 501; *Lord* v. *Litchfield,* 36 Conn. 116.

Neither in the 6th article of the bill of rights, nor elsewhere in the constitution, nor in the acts of 1791, 1819, and 1827, is there any contract of exemption from taxation, or any intention on the part of the legislature to make such a contract. Nor do the statutes of 1842, 1867, and 1878, expressly exempting meeting-houses from taxation, indicate any design to make a contract. In language and by relation they are general exemptions of a particular class of property, which the legislature has made, and which it may unmake by repeal. In these exemptions there is no vested right which can support the idea of a contract binding on succeeding legislatures, and irrepealable. *Hospital* v. *Philadelphia County,* 24 Penn. St. 229; *Christ's Church* v. *Philadelphia,* 24 How. 300; Cool. Tax. 53, 54, 145, 146.

We decide that the constitution does not exempt church property from taxation. Whether any exemption of the plaintiff's property is constitutional is a question we do not decide, because it is not raised by the case. The plaintiff is not in a situation to

object to exemption.   It cannot claim that it shall not pay any tax because $10,000 of its property is not taxed.

*Case discharged.*

STANLEY, J., did not sit: the others concurred.