In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-4604 & 05-4781

ANTHONY HINRICHS, HENRY GERNER,
LYNETTE HEROLD, et al.,

*Plaintiffs-Appellees,*

*v.*

SPEAKER OF THE HOUSE OF
REPRESENTATIVES OF THE
INDIANA GENERAL ASSEMBLY,

*Defendant-Appellant.*

———————

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05 C 813—**David F. Hamilton,** *Judge.*

———————

ARGUED SEPTEMBER 7, 2006—DECIDED OCTOBER 30, 2007

———————

Before RIPPLE, KANNE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Four Indiana taxpayers, Anthony
Hinrichs, Henry Gerner, Lynette Herold and Francis
White Quigley, brought this action against the Speaker of
the House of Representatives of the Indiana General
Assembly, challenging the House's practice of opening
each session with a prayer. The district court agreed
with the plaintiffs that the practice of legislative prayer as
implemented by the House violated the Establishment

Clause and issued a permanent injunction. The Speaker timely appealed and sought a stay of the district court's ruling pending full briefing before this court. We denied the stay but noted that our decision was based only on a preliminary understanding of the facts surrounding Indiana's practice. *See Hinrichs v. Bosma*, 440 F.3d 393 (7th Cir. 2006). After briefing, oral argument and supplemental briefing, we now hold that the plaintiffs do not have standing to maintain this action. We therefore reverse the district court's judgment and remand the action with instructions to dismiss for want of jurisdiction.

# I

# BACKGROUND

## A. Facts

Indiana's legislative authority is vested in the Indiana General Assembly, which is composed of the Senate and the House of Representatives. The House of Representatives meets in its chamber in the Indiana Statehouse, which has seating for the representatives and an observation gallery for about 75 to 100 members of the public.

House Rule 10.2 calls for a prayer or invocation to be given each meeting day before the House conducts any business. For the 188 years prior to the time the plaintiffs instituted this action, the Indiana House of Representatives opened each day with an invocation. The invocation occurs immediately after the Speaker's call to order. No legislative business takes place until the prayer is finished, and no one is required to remain in the House chamber

during the prayer.[1] The invocation is delivered from the Speaker's stand, and, according to House rules, no one may enter the Speaker's stand without invitation from the Speaker.

The invocation frequently is delivered by visiting clergy who have volunteered to pray and are nominated by a representative. On occasion, representatives have sponsored clergy who do not share their own religious affiliation. To nominate a member of the clergy, a representative fills out a "Minister of the Day" form setting forth the dates when the clergy member is available. The representative then submits the form to the Majority Caucus Chair, who schedules the cleric to deliver the invocation. No minister who has requested sponsorship ever has been turned down.

Prior to the date on which the visiting clergy member is to offer the invocation, a House staff member sends a letter setting forth the logistical details of the visit. The letter also states:

> The invocation is to be a short prayer asking for guidance and help in the matters that come before the members. We ask that you strive for an ecumenical prayer as our members, staff and constituents come from different faith backgrounds. Thank you for your consideration.

---

[1] The parties stipulated that members of the public seated in the balcony are "discourage[d] from leaving the balcony during the Pledge of Allegiance or the Invocation so as to minimize noise. However, if any individual indicates that he or she objects to the prayer or Pledge or if the individual expresses a desire to leave immediately the individual will be allowed to leave freely." R.17 at 1-2.

R.16, Att. 2. No further guidance is provided and no review of the content of the prayer is conducted prior to its being given; typically, the Speaker does not know the identity of the minister until a few minutes prior to his or her introduction.[2]

When a visiting clergy member has not been designated to give the prayer for a legislative session, a representative has given the invocation. On such an occasion, the representative does not receive guidance from anyone associated with the House concerning the form or content of the prayer. No one associated with the House ever has advised, corrected or admonished a minister or representative about the religious content of an invocation.

During the 2005 House session, the invocation was delivered by priests, Protestant ministers, several representatives, a rabbi and an imam. Of the forty-five prayers offered during this session for which text is available, twenty-nine prayers referenced "Jesus" or "Christ"; others invoked "God," "Lord," "Almighty God," or "Heavenly Father." *Id.* Att. 6 at 3, 7 (prayers of January 10 and 13, 2005 and February 17, 2005). At least one prayer was not addressed to a specific deity. *See id.* at 16-17 (prayer of April 14, 2005).

Several prayers were overtly Christian in content. For instance, one visiting cleric quoted several verses from a book of the New Testament as part of his prayer, *see id.* at 8 (prayer of February 28, 2005); still others referred to the "saving power of Jesus Christ," *id.* at 13 (prayer of March 28, 2005), to "our lord and savior Jesus Christ," *id.* at 14

---

[2] An exception to this typical arrangement occurs when the Speaker has sponsored the cleric of the day.

(prayer of April 5, 2005), or to Jesus Christ as the son of God, *id.* at 16 (prayer of April 11, 2005). Many of these references were limited to the doxology at the end of the prayer. There also were invocations given that were not tied to any specific faith or denomination. For instance, the prayer offered on April 14, 2005, referenced Buddha, the Zen masters, a philosopher and a story from the Bible. *See id.* at 16-17. Still others invoked only "God" or "Lord" and simply requested wisdom for the Assembly or blessings for the State. *See, e.g., id.* at 18 (prayer of April 19, 2005); *id.* at 14 (prayer of March 31, 2005). Some prayers were offered as the personal prayer of the clergy member, *see, e.g., id.* at 14-15 (prayer of April 5, 2005); others purported to be offered on behalf of those assembled, *see, e.g., id.* at 17 (prayer of April 18, 2005).

Although minimal, there were costs associated with the practice of offering the invocation. The initial letter sent to clergy cost $.54 per mailing. Before a session commenced, the House members sometimes took photographs with the clergy scheduled to give the invocation. These photographs cost $.68 per print and were mailed at a cost of $1.60 per print. A thank-you letter sometimes was sent to visiting clergy, also at a cost of $.54 per mailing. Additionally, the sessions of the Indiana House are broadcast on the Internet at a cost of $112.85 per hour, or $1.88 per minute; each prayer, whether offered by a member of the clergy or by a representative, lasted a few minutes. All funds used to cover these costs came from the general budget; no funds were appropriated specifically to cover these expenses.

**B. District Court Proceedings**

On May 31, 2005, four Indiana taxpayers, Anthony Hinrichs, Henry Gerner, Lynette Herold and Francis White Quigley, brought this action for declaratory and injunctive relief challenging the existing practice of the Indiana House of Representatives to allow sectarian prayers to be given prior to each legislative session. The Speaker of the House of Representatives of the Indiana General Assembly was named as the defendant. In the complaint, the plaintiffs stated that they did not object to the practice of legislative prayer, but claimed that the practice of the Indiana House of Representatives violated the First Amendment because it allowed overtly sectarian prayers to be offered. The Speaker answered the complaint and, among other matters, asserted lack of standing.

On October 28, 2005, the district court conducted a trial on stipulated facts and written submissions of the parties. On November 30, 2005, the district court entered a final order declaring the Speaker's practice of allowing sectarian prayer to be violative of the Establishment Clause and permanently enjoining the Speaker from "permitting sectarian prayers to be offered as part of the official proceedings of the House of Representatives." R.31 at 1.[3]

---

[3]  Specifically, the district court decreed:

> 1. That defendant Speaker of the House of Representatives of the Indiana General Assembly, in his official capacity, is permanently enjoined from permitting sectarian prayers to be offered as part of the official proceedings of the House of Representatives. If the Speaker chooses to continue to permit non-sectarian prayers as part of the official proceed-
> <span style="float:right">(continued...)</span>

The district court first addressed the Speaker's contention that the plaintiffs lacked standing to bring this action. In the district court's view, the plaintiffs had established taxpayer standing under the Supreme Court's and this court's case law. It stated:

> In this case the House's prayer practice is indeed paid for by taxpayer funds, through confirmation and thank-you letters and photographs sent to clergy, and additional web-streaming time. Though these costs are not directly attributable to the content of the invocations, they are directly attributable to the practice of legislative prayer that plaintiffs challenge. Because the plaintiffs are Indiana taxpayers who have proven "a measurable appropriation or disbursement of [public] funds occasioned solely by the activities complained of," *Doremus* [*v. Board of Education*], 342 U.S. [429,] 434 [(1952)], all four plaintiffs have standing under Article III to challenge the constitutionality of the official legislative prayers.

R.30 at 24. The district court then turned to the question of the constitutionality of the House's "Minister of the Day"

---

[3] (...continued)

ings, he shall advise all persons offering such prayers (a) that the prayers must be non-sectarian and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief, and (b) that the prayers should not use Christ's name or title or any other denominational appeal. This injunction applies to the Speaker, and to his agents, servants, employees, and attorneys, and all other persons in active concert with them who receive actual notice of this injunction by personal service or otherwise.

R.31 at 1-2.

program. It summarized its findings of fact and conclusions of law accordingly:

> [T]he evidence shows that the official prayers offered to open sessions of the Indiana House of Representatives repeatedly and consistently advance the beliefs that define the Christian religion: the resurrection and divinity of Jesus of Nazareth. The Establishment Clause "means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). 'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.'" *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 605 (1989), quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982). The sectarian content of the substantial majority of official prayers in the Indiana House therefore takes the prayers outside the safe harbor the Supreme Court recognized for inclusive, non-sectarian legislative prayers in *Marsh v. Chambers*, 463 U.S. 783 (1983). Plaintiffs have standing as Indiana taxpayers to bring their claims, and they are entitled to declaratory and injunctive relief. This relief will not prohibit the House from opening its session with prayers if it chooses to do so, but will require that any *official* prayers be inclusive and non-sectarian, and not advance one particular religion.

R.30 at 2.

After the court's injunction issued, the Speaker filed a motion pursuant to Federal Rule of Civil Procedure 59(e). The Speaker claimed that the court's injunction "manifest[ed] clear legal error because it exceed[ed] the Court's jurisdiction in taxpayer-standing cases" and "because it

[wa]s overly broad and d[id] not conform to the conduct challenged or the relief requested by the Plaintiffs." R.33 at 1. Additionally, the Speaker maintained that "the injunction [wa]s vague and [gave] the Speaker of the House no clear standard for application." *Id*. The Speaker also filed a motion to stay the enforcement of the injunction pending the district court's disposition of his Rule 59 motion. The plaintiffs opposed both motions.

On December 28, 2005, the court issued an order denying the Speaker's Rule 59 motion.[4] In its order, the district court first rejected the Speaker's argument "that the court should give him the choice between either (a) modifying the prayer practice to bring it within constitutional bounds, or (b) eliminating the public spending but continuing the unconstitutional pattern of sectarian Christian prayers." R.47 at 3. The district court stated:

> To describe the alternatives is to answer the question. The taxpayer plaintiffs have standing because of the public expenditures, but the law authorizes the court to order an end to the unconstitutional practice. The injury that gives the taxpayer-plaintiffs standing is the misuse of the public funds into which they pay their taxes.
>
> In taxpayer standing cases, the injury to the plaintiff may be remedied by enjoining the expenditure of public funds, but may also be remedied by enjoining the unconstitutional practice, especially where the constitutional issues do not depend on the expenditure of public funds.

*Id.* at 3-4 (citations omitted).

---

[4] This order rendered moot the Speaker's motion to stay.

The district court then turned to the Speaker's challenges to the terms of the injunction. The district court disagreed with the Speaker that the injunction should have been limited to opening prayers:

> The plaintiffs challenged the House's practice of official prayers conducted under House Rule 10, which calls for a prayer after the Speaker calls the House to order and before the Pledge of Allegiance. As noted, plaintiffs showed that the practice of inviting clergy or House members to offer the prayer has produced a pattern of sectarian and exclusionary Christian prayers. If the court had limited the injunction to prayers offered pursuant to House Rule 10 as it currently exists, the injunction would not have affected, for example, an amended rule that would switch the order of the Pledge of Allegiance and the prayer, or a practice of sectarian prayer at the end of each session instead of the beginning.

*Id.* at 7-8.

Finally, the district court addressed the Speaker's contention that "the injunction is too vague to give him fair notice of what he is required to do to comply with it." *Id.* at 9. Although the district court believed that the "injunction here [wa]s sufficiently specific," it nevertheless answered some of the Speaker's questions "because of the larger public interests at stake." *Id.* at 10. The court explained that "[t]he injunction is not limited to sectarian Christian prayers"; this simply was the focus of the court's decision because "the evidence here shows a pattern of Christian prayer." *Id.* at 12. The court also elaborated on what would constitute prayers that "are sectarian in the Christian tradition," specifically those that "proclaim or otherwise communicate the beliefs that Jesus of Nazareth

was the Christ, the Messiah, the Son of God, or the Savior, or that he was resurrected, or that he will return on Judgment Day or is otherwise divine." *Id.* at 16. With that clarification, the court denied the motion to alter or amend the judgment.

The Speaker timely appealed to this court.

## II

## DISCUSSION

Before we turn to the substantive claims, we first must address the "threshold jurisdictional question" of whether the plaintiffs possess the requisite standing to pursue this action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The party "asserting federal jurisdiction" must "carry the burden of establishing [its] standing under Article III." *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006).

When we first approached this issue on the Speaker's motion to stay, we noted that, in order to establish taxpayer standing—the only basis for standing asserted here[5]—the plaintiffs "must demonstrate that the challenged

---

[5]  As noted by our dissenting colleague, a pecuniary interest is not the only means of establishing standing. *See* dissent at 43-44. In the context of an alleged Establishment Clause violation, we have stated that "allegations of direct and unwelcome exposure to a religious message" are sufficient to show the injury-in-fact necessary to support standing. *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1159 (7th Cir. 1994); *see also ACLU v. City of St. Charles*, 794 F.2d 265, 268-69 (7th Cir. 1986). The plaintiffs

(continued...)

program is supported by monies raised through taxes and that the use of those monies exceeds a specific constitutional limitation on the use of public funds, such as the First Amendment's prohibition on laws respecting an establishment of religion." *Hinrichs*, 440 F.3d at 396. Since briefing in this case was completed, the Supreme Court handed down its decision in *Hein v. Freedom from Religion Foundation, Inc.*, 127 S. Ct. 2553 (2007), in which the Court offered significant guidance concerning the breadth of its taxpayer standing jurisprudence. We invited the parties to submit supplemental briefs discussing the impact of *Hein* on the plaintiffs' standing in this case.

In light of *Hein*, the Speaker reasserts that the plaintiffs lack standing here. According to the Speaker, the Supreme Court made clear in *DaimlerChrsyler Corp. v. Cuno*, 126 S. Ct. 1854, 1863 (2006), that the taxpayer standing requirements for federal taxpayers apply with equal force to state taxpayers. Accordingly, *Hein* directly applies to this action and "forecloses taxpayer standing in this case because the Plaintiffs have not identified—and cannot identify—any

---

[5] (...continued)
initially asserted both standing as taxpayers and, with respect to Mr. Hinrichs, standing as individual subject to "direct and unwelcome exposure" to the House prayers as a result of his job as a lobbyist. The plaintiffs, however, abandoned this alternative basis for standing in the district court when Mr. Hinrichs ceased being a lobbyist and informed the court that "he ha[d] no plans to lobby for any organization or entity in the Indiana General Assembly." R. 29 at 1. Thereafter, the plaintiffs relied exclusively on their status as taxpayers to support standing. Consequently, in order to maintain their action, the plaintiffs must meet the requirements for taxpayer standing set forth below.

specific legislative appropriations that 'expressly authorize, direct or even mention the expenditures of which [the plaintiffs] complain.' " Appellant's Supp. Br. at 5. For their part, the plaintiffs maintain that *Hein* did nothing to disturb the holding of *Flast v. Cohen*, 392 U.S. 83 (1968), or of *Doremus v. Board of Education*, 342 U.S. 429, 434-45 (1952), which, unlike *Flast*, dealt explicitly with the question of state taxpayer standing. According to the plaintiffs, all that *Doremus* and *Flast* require of state taxpayers is a "good-faith pocketbook" injury, that is, "a financial interest that is, or is threatened to be, injured by the unconstitutional conduct." *Doremus*, 342 U.S. at 434-35; *see* Appellees' Supp. Br. at 4.

Upon consideration of the Court's disposition in *Hein*, and the parties' supplemental arguments, we believe that *Hein* requires us to revisit our preliminary determination that the plaintiffs possess the requisite standing to maintain this action. In order to explain our determination, a more plenary discussion of taxpayer standing, especially taxpayer standing to challenge alleged Establishment Clause violations, is in order.

### A. Taxpayer Standing Prior to *Flast v. Cohen*

Our discussion must begin with the Supreme Court's initial pronouncements on taxpayer standing set forth in *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447 (1923). In that case, the plaintiffs, as federal taxpayers, challenged the constitutionality of the Maternity Act on the grounds that the appropriations authorized by the Act were "for purposes not national, but local to the states," and the effect of the statute was to take the plaintiffs' property, namely their tax dollars,

without due process of law. *Id.* at 479-81. The Court
determined that the interests of a federal taxpayer were
not sufficiently direct or certain to support a general
challenge to a congressional appropriations statute: "His
interest in the moneys of the Treasury—partly realized
from taxation and partly from other sources—is shared
with millions of others; is comparatively minute and
indeterminable; and the effect upon future taxation, of any
payment out of the funds, so remote, fluctuating and
uncertain, that no basis is afforded for an appeal to the
preventive powers of a court of equity." *Id.* at 487. The
Court explained that passing on the constitutionality of a
statute, absent a plaintiff who has suffered a direct and
concrete injury as a result of a congressional enactment,
would result in a violation of the separation of powers:

> We have no power *per se* to review and annul acts
> of Congress on the ground that they are unconstitu-
> tional. That question may be considered only when the
> justification for some direct injury suffered or threat-
> ened, presenting a justiciable issue, is made to rest
> upon such an act. Then the power exercised is that of
> ascertaining and declaring the law applicable to the
> controversy. . . . The party who invokes the power
> must be able to show, not only that the statute is
> invalid, but that he has sustained or is immediately
> in danger of sustaining some direct injury as the re-
> sult of its enforcement, and not merely that he suffers
> in some indefinite way in common with people gener-
> ally. If a case for preventive relief be presented the
> court enjoins, in effect, not the execution of the
> statute, but the acts of the official, the statute notwith-
> standing. Here the parties plaintiff have no such case.
> Looking through forms of words to the substance of

their complaint, it is merely that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional; and this we are asked to prevent. To do so would be, not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess.

*Id.* at 488-89.

In articulating the rationale for denying standing to federal taxpayers, the Court noted that the interest of federal taxpayers with respect to the federal treasury were "very different" from that of a municipal taxpayer challenging an allegedly illegal use of municipal funds:

The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. . . . The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation.

*Id.* at 486-87.

The Court next addressed taxpayer standing in *Doremus*. There, state taxpayers challenged a New Jersey statute requiring the recitation of five verses of the Old Testament at the beginning of each school day; the activity was not "supported by any separate tax or paid for from any particular appropriation," nor did "it add[] any sum whatever to the cost of conducting school." *Doremus*, 342 U.S. at 433.

In deciding whether the taxpayers could pursue their challenge, the Court first reiterated its statements from prior cases that "the interests of a [federal taxpayer] in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure." *Id.* at 433. The Court went on to observe that what it had said "of a federal statute" was "equally true when a state Act [wa]s assailed: 'The party who invokes the power must be able to show, not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.' " *Id.* at 434 (quoting *Frothingham*, 262 U.S. at 488). The Court then held that the case or controversy requirement is met by a state taxpayer only when the taxpayer brings "a good-faith pocketbook action." *Id.* It is a question, the Court stated, "of possession of the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct." *Id.* at 435. Finding this financial interest lacking, the Court held that the state taxpayers could not maintain their challenge to the statute.

## B.  *Flast v. Cohen*

In *Flast*, the Court considered whether there were any exceptions to the bar against taxpayer standing erected in *Frothingham*. Specifically, the Court had to decide "whether the *Frothingham* barrier should be lowered when a taxpayer attacks a federal statute on the ground that it violates the Establishment and Free Exercise Clauses of the First Amendment." *Id.* at 85. At issue in *Flast* was the constitutionality of the Elementary and Secondary Educa-

tion Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (codified at 20 U.S.C. § 241a et seq. (1964)), which, among other matters, "appropriated [funds] . . . to finance instruction in reading, arithmetic, and other subjects in religious schools, and to purchase textbooks and other instructional materials for use in such schools." *Id.* at 85-86.

In addressing the standing issue, the Court first turned to its holding in *Frothingham*. In that case, the Court recounted, it had

> noted that a federal taxpayer's "interest in the moneys of the treasury . . . is comparatively minute and inde-terminable" and that "the effect upon future taxation, of any payment out of the (Treasury's) funds, . . . (is) remote, fluctuating and uncertain." As a result, the Court ruled that the taxpayer had failed to allege the type of "direct injury" necessary to confer standing.

*Id.* at 92 (quoting *Frothingham*, 262 U.S. at 487-88). The Court then observed that its opinion in *Frothingham* had engendered some confusion concerning the legal and philosophical bases for standing. This confusion, the Court continued, suggested that it "should undertake a fresh examination of the limitations upon standing to sue in a federal court and the application of those limitations to taxpayer suits." *Id.* at 94.

The Court, however, did not turn immediately to the concept of standing, but first examined the limitations placed on federal courts by the case or controversy require-ment of Article III. Justiciability, the Court explained, was not merely prudential, but firmly rooted in Article III:

> [T]he implicit policies embodied in Article III, and not history alone, impose the rule against advisory opin-ions on federal courts. When the federal judicial power

is invoked to pass upon the validity of actions by the Legislative and Executive Branches of the Government, the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III.

*Id.* at 96. However, the Court also acknowledged that "[t]he 'many subtle pressures' which cause policy considerations to blend into the constitutional limitations of Article III make the justiciability doctrine one of uncertain and shifting contours." *Id.* at 97 (footnote omitted).

The Court also noted that, as "an aspect of justiciability," "standing is surrounded by the same complexities and vagaries that inhere in justiciability." *Id.* at 98. However, "[d]espite the complexities and uncertainties," the Court continued,

some meaningful form can be given to the *jurisdictional limitations* placed on federal court power by the concept of standing.

The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."

*Id.* at 99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)) (emphasis added). This requirement of a "proper party" was necessary so that "federal courts w[ould] not be asked

to decide 'ill-defined controversies over constitutional issues,' " or cases which were "hypothetical" or "abstract." *Flast*, 392 U.S. at 100 (quoting *United Pub. Workers v. Mitchell*, 330 U.S. 75, 90 (1947), and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937), respectively). The Court then summarized the relationship between standing and Article III jurisdiction:

> Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. It is for that reason that the emphasis in standing problems is on whether the party invoking federal court jurisdiction has "a personal stake in the outcome of the controversy," and whether the dispute touches upon "the legal relations of parties having adverse legal interests."

*Id.* at 101 (quoting *Baker*, 369 U.S. at 204, and *Aetna Life Ins. Co.*, 300 U.S. at 240-41, respectively).

This requirement did not eliminate the possibility that a federal taxpayer may have "the requisite personal stake in the outcome" of a particular case necessary to establish standing. *Flast*, 392 U.S. at 101. Indeed, the Court stated that the requisite stake could be established under the following circumstances:

> The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spend-

ing clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in *Doremus v. Board of Education*, 342 U.S. 429 (1952). Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction.

*Id.* at 102-03.

Turning then to the specific plaintiffs in the case, the Court held that each nexus had been established. With respect to the first nexus, the taxpayers' challenge was made to an exercise of Congress' taxing and spending power under Article I, Section 8 of the United States Constitution. With respect to the second nexus, the Court noted that the taxpayers alleged that the challenged expenditures violated the Establishment Clause, which operated as a specific limitation on Congress' spending power: "Our history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one

religion over another or to support religion in general." *Id.* at 103.

The Court then summarized its holding accordingly:

> [W]e hold that a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power. The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power. Such an injury is appropriate for judicial redress, and the taxpayer has established the necessary nexus between his status and the nature of the allegedly unconstitutional action to support his claim of standing to secure judicial review. Under such circumstances, we feel confident that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution.

*Id.* at 105-06.

## C. Standing Cases after *Flast*

Over the next few years, litigants tested *Flast*'s boundaries by attempting to use taxpayer standing to challenge different kinds of federal governmental actions. For

instance, in *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464 (1982), plaintiffs sought to challenge as violative of the Establishment Clause the transfer of federal property by the Department of Health, Education and Welfare to a sectarian institution. The Court, however, held that the plaintiffs lacked standing to maintain their action because "*Flast* limited taxpayer standing to challenges directed 'only [at] exercises of congressional power'" under the Taxing and Spending Power. *Valley Forge*, 454 U.S. at 479 (quoting *Flast*, 392 U.S. at 102). Similarly, in *United States v. Richardson*, 418 U.S. 166 (1973), the Court held that a taxpayer did not have standing to pursue his action which sought a detailed accounting of expenditures by the Central Intelligence Agency. According to the Court, the taxpayer had not tied his status as a taxpayer to the "taxing or spending power," nor had he claimed that appropriated funds were being spent in violation of a specific constitutional limitation on that power. *Id.* at 175.

The Court has been equally unwilling to see *Flast* as a means of extending *state* taxpayer standing. As noted above, the Court previously had suggested in *Doremus* that the limitations on federal taxpayer standing were equally applicable to state taxpayers challenging state actions.[6] The

---

[6]  In *Doremus v. Board of Education*, 342 U.S. 429 (1952), the Court stated:

> [W]e reiterate what the Court said of a federal statute as equally true when a state Act is assailed: "The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a re-
> (continued...)

Court again focused on the question of state taxpayer standing in *Cuno*.[7] In *Cuno*, state taxpayers sought to challenge actions by the city of Toledo and the State of Ohio to encourage the manufacture of Jeeps in the Toledo area, specifically through offering local and state tax benefits for new investment. The taxpayers alleged that the granting of tax credits under these circumstances violated the Commerce Clause. Without addressing the parties' standing, the Sixth Circuit reached the merits of the plaintiffs' claims and held that the tax credit was invalid. The Supreme Court granted review, but requested that the parties also "address whether [the] plaintiffs have standing to challenge the franchise tax credit in this litigation." *Id.* at 1860.

In its opinion, the Court noted that it was asked to decide "an important question of constitutional law concerning the Commerce Clause." *Id.* at 1861. Before it turned to that question, however, it had to determine whether the "plaintiffs, as the parties now asserting federal jurisdiction, [had] carr[ied] the burden of establishing their standing under Article III." *Id.* (internal citations omitted).

In addressing the standing issue, the Court reviewed the roots of its taxpayer standing jurisprudence in *Frothingham*:

---

[6] (...continued)

    sult of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

*Id.* at 434 (quoting *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).

[7] Neither the district court, nor this court in considering the motion for stay, had the benefit of this decision.

In rejecting a claim that improper federal appropria-
tions would "increase the burden of future taxation
and thereby take [the plaintiff's] property without due
process of law," the Court observed that a federal
taxpayer's "interest in the moneys of the Treasury . . .
is shared with millions of others; is comparatively
minute and indeterminable; and the effect upon future
taxation, of any payment out of the funds, so remote,
fluctuating and uncertain, that no basis is afforded
for an appeal to the preventive powers of a court of
equity."

*Id.* at 1862 (quoting *Frothingham*, 262 U.S. at 486-87). The
Court then noted that the "rationale for rejecting federal
taxpayer standing applies with undiminished force to
state taxpayers." *Cuno*, 126 S. Ct. at 1863. The application
of the principle to the states was indicated, the Court
stated, in *Doremus*:

In that case, we noted our earlier holdings that "the
interests of a taxpayer in the moneys of the federal
treasury are too indeterminable, remote, uncertain and
indirect" to support standing to challenge "their
manner of expenditure." We then "reiterate[d]" what
we had said in rejecting a federal taxpayer challenge
to a federal statute "as equally true when a state Act
is assailed: 'The [taxpayer] must be able to show . . .
that he has sustained . . . some direct injury . . . and not
merely that he suffers in some indefinite way in com-
mon with people generally.' "

*Id.* (quoting *Doremus*, 342 U.S. at 433-34).

Indeed, the Court noted that failure to extend the bar
against general taxpayer standing to state taxpayers
challenging appropriations made by state statutes could
raise serious federalism issues:

> Federal courts may not assume a particular exercise of this state fiscal discretion in establishing standing; a party seeking federal jurisdiction cannot rely on such "[s]peculative inferences . . . to connect [his] injury to the challenged actions of [the defendant]," *Simon* [*v. Eastern Kentucky Welfare Rights Org.*], 426 U.S. [26, 45 (1976)] . . . . Indeed, because state budgets frequently contain an array of tax and spending provisions, any number of which may be challenged on a variety of bases, affording state taxpayers standing to press such challenges simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as " 'virtually continuing monitors of the wisdom and soundness' " of state fiscal administration, contrary to the more modest role Article III envisions for federal courts. *See* [*Allen v. Wright*, 468 U.S. 737, 760-61 (1984)] (quoting *Laird v. Tatum*, 408 U.S. 1, 15 (1972)).

*Cuno*, 126 S. Ct. at 1864.

Thus, the Court concluded, "we hold that state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *Id.* at 1864. Finally, the Court rejected the plaintiffs' attempts to analogize their challenge under the Commerce Clause to the Establishment Clause violation alleged in *Flast*. The Court believed that the broad application of *Flast* urged by the plaintiffs "would be quite at odds with its narrow application in our precedent and *Flast*'s own promise that it would not transform federal courts into forums for taxpayers' 'generalized grievances.' " *Id.* at 1865 (quoting *Flast*, 392 U.S. at 106).

**D.** *Hein v. Freedom from Religion Foundation*

It is against this jurisprudential framework that we must view the Supreme Court's decision in *Hein* and consider its application to the present case. In *Hein*, federal taxpayers challenged part of the President's Faith Based and Community Initiatives program as violative of the First Amendment's Establishment Clause. The plaintiffs maintained that they possessed taxpayer standing to challenge the program because funds from the federal treasury, specifically "general Executive Branch appropriations," *Hein*, 127 S. Ct. at 2559, were used to fund the initiative. A divided panel of this court determined that the plaintiffs had shown the necessary injury under *Flast*, and its progeny, to establish taxpayer standing. Specifically, the majority held that:

> The difference, then, between this case on the one hand and *Flast* and [*Bowen v.*] *Kendrick*[, 487 U.S. 589 (1988),] on the other is that the expenditures in those cases were pursuant to specific congressional grant programs, while in this case, there is no statutory program, just the general "program" of appropriating some money to executive-branch departments without strings attached. The difference cannot be controlling.

*Freedom from Religion Found., Inc. v. Chao*, 433 F.3d 989, 994 (7th Cir. 2006). The Supreme Court disagreed. After reiterating the test for taxpayer standing set forth in *Flast*, *see Flast*, 392 U.S. at 102-03, the plurality determined that the difference between a specific congressional enactment authorizing the expenditure of funds and an expenditure made from general funds appropriated to the Executive Branch was a critical one: The necessary link between "congressional action and constitutional violation that

supported taxpayer standing in *Flast* [wa]s missing." *Hein*, 127 S. Ct. at 2566. The plurality explained that the

> [r]espondents do not challenge any specific congressional action or appropriation; nor do they ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional. That is because the expenditures at issue here were not made pursuant to any Act of Congress. Rather, Congress provided general appropriations to the Executive Branch to fund its day-to-day activities. These appropriations did not expressly authorize, direct, or even mention the expenditures of which respondents complain. Those expenditures resulted from executive discretion, not congressional action.

*Id.* at 2566 (footnote omitted). Consequently, the plurality concluded that "this case falls outside the 'narrow exception' that *Flast* 'created to the general rule against taxpayer standing established in *Frothingham*.' " *Id*. at 2568 (quoting *Kendrick*, 487 U.S. at 618). "Because the expenditures that respondents challenge were not expressly authorized or mandated by any specific congressional enactment," the Justices in the plurality explained, "respondents' lawsuit is not directed at an exercise of congressional power, and thus lacks the requisite 'logical nexus' between taxpayer status 'and the type of legislative enactment attacked.' " *Hein*, 127 S. Ct. at 2568 (quoting *Flast*, 392 U.S. at 102) (additional citations omitted).

### E. Application

We believe that there are several guiding principles to take away from the cases we just have discussed. First, the general rule, articulated first in *Frothingham* and reiterated

most recently in *Hein*, is that federal taxpayers may not lodge constitutional challenges against congressional appropriations. The exception to the general rule set forth in *Frothingham* is a narrow one: Indeed, the exception only applies when the taxpayer has established a "logical link between [his taxpayer] status and the type of legislative enactment attacked" as well as "a nexus between that status and the precise nature of the constitutional infringement alleged." *Flast*, 392 U.S. at 102-03. Second, the nexus between the plaintiff's taxpayer status and the legislative enactment must be a direct one. The plurality of the Court made clear in *Hein* that only "expenditures made pursuant to an express congressional mandate and a specific congressional appropriation" met the first nexus requirement; the plurality rejected the plaintiffs' claim that any "expenditure of government funds in violation of the Establishment Clause" would meet this requirement. *See Hein*, 127 S. Ct. at 2565 (internal quotation marks omitted). In the context of an alleged Establishment Clause violation, the nexus requirement is not met absent "the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion." *Cuno*, 126 S. Ct. at 1865 (quoting *Flast*, 392 U.S. at 106). Finally, state taxpayers are held to the same standing requirements as federal taxpayers. They must establish the requisite nexus between their status and the challenged enactment in order to meet the test articulated in *Flast*. Anything less "would interpose the federal courts as ' "virtually continuing monitors of the wisdom and soundness" ' of state fiscal administration, contrary to the more modest role Article III envisions for federal courts." *Cuno*, 126 S. Ct. at 1864 (quoting *Allen*, 468 U.S. at 760-61). With these principles in mind, we turn to the standing claim made by the plaintiffs.

In the present case, the plaintiffs are challenging the practice of legislative prayer as implemented by the Indiana House of Representatives. It is clear from the parties' stipulations that Indiana's practice consists of a "Minister of the Day" program that involves the offering of a prayer by a member of the clergy with representatives filling in to offer the invocation only when "no cleric [is] present." R.16 at 3. The program, as it is presently administered, is not mandated by statute. The origin of the practice is House Rule 10.2, and that rule merely provides that a prayer or invocation be given each meeting day before the House conducts any business. The manner in which the program is currently administered is a matter of House tradition, implemented at the discretion of the Speaker. Although there is some minimal amount of funds expended in the administration of the program, the plaintiffs have not pointed to any specific appropriation of funds by the legislature to implement the program. Furthermore, other than the costs of webcasting, the only costs incurred are postage for the sending of thank-you letters and pictures. These costs not only are unrelated to the content of the prayers offered, they are unnecessary for the administration of the "Minister of the Day" program.

Under these circumstances, we simply cannot conclude that the nexus requirements of *Flast*, as explained in *Hein*, have been met. The plaintiffs have not tied their status as taxpayers to the House's allegedly unconstitutional practice of regularly offering a sectarian prayer. They have not shown that the legislature has extracted from them tax dollars for the establishment and implementation of a program that violates the Establishment Clause. The appropriations, which cover the incidental costs of the program, "did not expressly authorize, direct, or even

mention the expenditures," *Hein*, 127 S. Ct. at 2566, atten-
dant to the "Minister of the Day" program. Instead, the
plaintiffs allege only an " 'expenditure of government
funds in violation of the Establishment Clause,' " which
the Court explicitly rejected as inadequate in *Hein. Id.* at
2565 (internal citations omitted).[8]

Despite the lack of specific direction by the state legisla-
ture to establish the Minister of the Day program and the
lack of specific appropriations dedicated to the program,
the plaintiffs maintain that *Hein* does not require this
court to reconsider the preliminary conclusion of the stay
panel that the plaintiffs possessed standing to maintain this

---

[8] The dissent asserts that the requisite connection between the
allegedly unconstitutional practice and the expenditure of
funds is established by the initial adoption of House Rule 10.2
in conjunction with the House's later action in passing a bud-
get, which included appropriations for the general operations of
the House. We do not believe these two actions satisfy the
requirement, set forth in *Hein*, that the challenged expenditures
be "expressly authorized or mandated" by a "specific con-
gressional enactment." *Hein v. Freedom from Religion Foundation,
Inc.*, 127 S. Ct. 2553, 2568 (2007); *see also id.* at 2566 (finding the
requisite nexus missing because "[t]hese appropriations did
not expressly authorize, direct, or even mention the expendi-
tures of which respondents complain"). The plaintiffs do not
challenge Rule 10.2; indeed, they acknowledge the constitution-
ality of some form of legislative prayer. Instead, it is the present
practice of employing a minister of the day, and the resulting
sectarian prayers, that the plaintiffs seek to enjoin. However,
as demonstrated above, there is no specific appropriation
either for Rule 10.2 or for the Minister of the Day program.
Absent such an appropriation, the necessary link between the
taxpayer and the expenditure for the allegedly unconstitutional
practice has not been established.

action. The plaintiffs note that the Supreme Court in *Hein* did not disturb its holding in *Flast*: "We do not extend *Flast*, but we also do not overrule it. We leave *Flast* as we found it." *Id.* at 2571-72. Because this court's initial determination was based on *Flast* (and case law interpreting *Flast*), the plaintiffs urge that *Hein* leaves undisturbed the stay panel's standing determination. We cannot agree.

Although the Supreme Court's plurality characterized its opinion as effecting no change in *its* view of the law of taxpayer standing, the plurality's decision, especially when read with *Cuno*, clarified significantly the law of taxpayer standing for the lower federal courts. For instance, our treatment of taxpayer standing at the time we addressed the Speaker's motion for stay articulated a more malleable vision of *Flast* than the one articulated by the plurality in *Hein*. In our earlier treatment, we stated: "Both parties accept that, in order to have standing as a taxpayer, a person must demonstrate that the challenged program is supported by monies raised through taxes and that the use of those monies exceeds a specific constitutional limitation on the use of public funds, such as the First Amendment's prohibition on laws respecting an establishment of religion." *Hinrichs*, 440 F.3d at 396. *Hein*, however, explains that the "use" of funds for the allegedly unconstitutional program, without more, is not sufficient to meet the nexus required by *Flast*. Instead, it is the appropriation of those funds for the allegedly unconstitutional purpose that provides the link between taxpayer and expenditure necessary to support standing.[9]

---

[9] The plaintiffs also argue that "this Court has also consistently acknowledged that *Flast* gives a taxpayer standing to challenge any type of state or local 'tax dollar expenditures that allegedly

(continued...)

---

[9]  (...continued)
contribute to Establishment Clause violations. *Flast v. Cohen*.' "
Appellees' Supp. Br. at 5 (quoting *Gonzales v. North Township of
Lake County, Indiana*, 4 F.3d 1412, 1416 (7th Cir. 1993)). However,
as the plaintiffs acknowledge, the case on which they rest this
proposition, *Gonzales*, concerns the standing of municipal tax-
payers to challenge municipal expenditures. As already noted,
since its first pronouncements on taxpayer standing, the
Supreme Court has distinguished between the standing re-
quirements for federal and state taxpayers, on the one hand,
and municipal taxpayers on the other. With one exception, the
other cases from this circuit which are cited by the plaintiffs
fall into one of two categories: (1) state taxpayer challenges to
specific state legislative appropriations (which would meet the
standards under *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854
(2006), and *Hein v. Freedom from Religion Foundation, Inc.*, 127
S. Ct. 2553 (2007)), and (2) municipal taxpayer challenges to
municipal actions (which are not subject to the same strin-
gent standing requirements as state and federal taxpayers
seeking to challenge state and federal actions, respectively).

The one case that warrants further comment is *Van Zandt
v. Thompson*, 839 F.2d 1215 (7th Cir. 1988). In *Van Zandt*, the
Illinois House of Representatives passed a resolution "which
provided for the conversion of a hearing room in the Illinois
State Capitol Building . . . into a prayer room." *Id.* at 1216. The
resolution "contemplate[d] that private donations w[ould] be
raised to cover the cost of renovating and maintaining the
room." *Id.* at 1217.

On appeal, our discussion of standing was brief:

The district court held and neither of the parties has dis-
puted that Van Zandt has standing to sue since he is an
Illinois taxpayer and since the proposed prayer room would
arguably place economic burdens of various sorts on the
State of Illinois and its taxpayers. *Van Zandt v. Thompson*,

(continued...)

We are well aware of the time and energy that the parties and the district court have expended on the merits of this matter. However, "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Cuno*, 126 S. Ct. at 1860-61.

## Conclusion

For the foregoing reasons, we reverse the district court's judgment, and we remand the case to the district court with instructions to dismiss for want of jurisdiction. The Speaker may recover his costs in this court.

REVERSED and REMANDED
WITH INSTRUCTIONS

---

[9]  (...continued)

649 F.Supp. 583, 587 (N.D. Ill. 1986) (citing *Marsh v. Chambers*, 463 U.S. 783, 786 n.4 (1983)). Similarly, the district court held that the "Freedom from Religion Foundation, Inc.," a Wisconsin not-for-profit corporation, has associational standing as a representative of its members who are Illinois taxpayers. *Id.* at 588 n.4. These determinations appear to be correct and have not been challenged by any of the parties. We therefore accept them.

*Id.* (parallel citations omitted). After *Cuno* and *Hein*, such amorphous burdens on state taxpayers would not meet *Flast*'s narrow exception to taxpayer standing. Indeed, the resolution at issue did not authorize any expenditure of funds, nor did it contemplate the use of any state taxes for the renovation and maintenance of the room. Consequently, the district court's assessment that the room would "place economic burdens of various sorts" on the state taxpayers was merely speculative and could not support the concrete injury to the plaintiffs as taxpayers necessary to support standing.

WOOD, *Circuit Judge*, dissenting. One of the crowning achievements of the American Experiment has been the relative harmony in which people of differing religious beliefs have joined together to create a common civil society. A glance around the rest of the world today offers a sad reminder that many other countries have not been so lucky. Religious strife between Jews and Muslims is a principal component of the longstanding hostility between Israelis and Palestinians; violence between the Sunni and the Shi'a sects of Islam has taken a bloody toll in Iraq in recent years; Northern Ireland was torn by violence between Protestants and Catholics for decades. The most recent International Religious Freedom Report issued by the Bureau of Democracy, Human Rights and Labor of the U.S. Department of State ("2007 Religious Freedom Report") identifies five major categories of abuse of the right to religious freedom, some blatant, some subtle, but all extant in some parts of the world. 2007 Religious Freedom Report, Executive Summary ¶ 4, available at http://www.state.gov/g/drl/rls/irf/2007/90080.htm (last visited Oct. 1, 2007). The report goes on to single out (1) totalitarian and authoritarian regimes that seek to control religious thought and expression; (2) states that display hostility toward minority or non-approved religions; (3) states that fail to address either societal discrimination or societal abuses against religious groups; (4) states that enact discriminatory legislation or implement policies that favor majority religions and disadvantage minority religions; and (5) states that otherwise respect religious freedom, but that discriminate against certain religions by identifying them as dangerous cults or sects. *Id.* ¶¶ 5-9. Although we do have our religious differences in the United States, they are far outnumbered by our understanding of commonal-

ity. In no small part, this accomplishment is a result of the delicate balance drawn in the First Amendment to the Constitution between the protection of each person's right freely to exercise his or her religion and the prohibition against the establishment of a state religion.

Another characteristic of which Americans are rightly proud is the tradition of individualism, not in the sense of selfishness, but in the sense of each citizen's willingness to shoulder whatever burdens need to be assumed and to take responsibility for herself, her family, her community, and the greater world around her. Americans classically do not sit back and wait for someone else to solve a problem. This may help to explain why the tradition of the private attorney general arose in the United States and continues to be such an important part of American public law. It may also help to explain why there has always been a healthy skepticism about "government." Those entrusted with governmental power might exceed their mandate, which is why, as James Madison explained in *Federalist No. 51* (among other places), the Framers of the Constitution chose a system of mutual checks and balances. *The Federalist No. 51* (James Madison) (Gideon ed. 2001). Speaking about the dangers from an unchecked Legislative Branch in *Federalist No. 48*, Madison noted that in Pennsylvania "it appear[ed] that the constitution had been flagrantly violated by the legislature in a variety of important instances." *Id.* No. 48, at 259 (James Madison). Madison's concern that "[i]f a majority be united by a common interest, the rights of the minority will be insecure," *id*. No. 51, at 270, is well known. Madison himself thought that this problem would largely be solved by shifting coalitions of interest groups. With the rise of political parties, however, coalitions have not shifted as

fluidly inside legislative bodies as the Framers may have thought they would. An alternative check, which was also built into the Constitution, has supplemented the Madisonian idea—the use of the Judicial Branch to rein in unconstitutional actions by either the Legislative Branch or the Executive Branch.

As the Supreme Court has stressed, the Judicial Branch can perform this function only when the person seeking to invoke the aid of the courts has presented a "Case or Controversy" in the sense that Article III of the Constitution uses that phrase. One aspect of this Article III command is that the plaintiff must have "standing to sue." Put negatively, standing is lacking when "even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination." 13 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice & Procedure* § 3531 at 338-39 (2d ed. 1984). As this court recently noted in *Winkler v. Gates*, 481 F.3d 977 (7th Cir. 2007), "there are three elements of Article III standing: injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Id.* at 979, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The question in the case before us is whether the plaintiffs are entitled to a judicial determination of the question whether certain rules and practices of Indiana's legislature—rules that they assert injure them in their capacity as state taxpayers—violate the Establishment Clause of the First Amendment. My colleagues, relying on the plurality opinion by Justice Alito in the case of *Hein v. Freedom From Religion Foundation*, 127 S.Ct. 2533 (2007), conclude that the answer is no. In my view, they are overlooking crucial points of the rationale expressed in the plurality opinion,

as well as the fact that seven Justices out of nine still consider *Flast v. Cohen*, 392 U.S. 83 (1968), to be good law. As I explain below, the differences between our case and *Freedom From Religion* put ours squarely within the confines (narrow though they may be) of the standing doctrine recognized in *Flast*. I would find that the plaintiffs here have standing to sue and would proceed to the merits of the case.

**I**

This case, as the majority has explained, concerns the use of chaplains in Indiana's House of Representatives ("the House"). The House uses a system of rotating chaplains, rather than a single official who is appointed to serve in that capacity for a stated term. (For a discussion of the difference between the two types, see Jeremy G. Mallory, Comment, *"An Officer of the House Which Chooses Him, and Nothing More": How Should* Marsh v Chambers *Apply to Rotating Chaplains?*, 73 U. Chi. L. Rev. 1421, 1426-30 (2006).) In the interest of avoiding any dispute about the way in which the chaplain of the Indiana House functions, I take most of the discussion that follows from the brief filed on behalf of the Speaker of the House before this court. The Speaker begins by noting that the legislative authority in Indiana is vested in the General Assembly, which is a bicameral body consisting of the Senate and the House. Ind. Const. art. IV, § 1. The House has 100 members; those members elect a Speaker, who has authority over the House. Ind. Const. art. IV, § 10; Ind. Code § 2-2.1-1-7; Rules of the House of Representatives ("the Rules"), Part III.B 19-20 and Part I. The Speaker presides over the House from the Speaker's stand at the front of the House; under

the Rules, no person may enter the Speaker's stand without the Speaker's invitation.

Part II of the Rules outlines the conduct of business before the House; it includes such matters as the time of convening, deadlines, quorum, and votes necessary for action. Rule 10 spells out the usual order of business. In pertinent part, it reads as follows:

    10.1   Calling the House to order

    10.2   Prayer

    10.3   Pledge of Allegiance

    10.4   Roll call

At that point, assuming that a quorum is present, the day's business gets underway, with reports from committees, introduction of resolutions and bills, and other matters. See Rules 10.4-10.8. The focus in this case is on Rule 10.2, which calls for a prayer. The Speaker explains that the prayer is generally offered by a religious cleric who has been invited to the House for that purpose; if no cleric is present, a Representative will offer a prayer instead. The Speaker authorizes the clerics or Representatives to ascend to the Speaker's stand to pronounce the prayer. Invocations of this type have been offered in the House for 188 years. (Indiana became the 21st state on December 3, 1818; presumably the Speaker means to say that there has never been a time since statehood when such prayers were not offered. See http://www.statelib.lib.in.us/www/ihb/publications/tlstatehood.html (last visited Sept. 25, 2007).)

The invited clerics are chosen by Representatives, who complete a "Minister of the Day" form indicating when the person is available to serve. Once the form is received,

the actual date is scheduled. After a cleric is selected to offer the prayer, he or she will receive a brief form letter. Apart from passing along logistical details, the letter offers the following guidance:

> The invocation is to be a short prayer asking for guidance and help in the matters that come before the members. We ask that you strive for an ecumenical prayer as our members, staff and constituents come from different faith backgrounds. Thank you for your consideration.

As the majority notes, the legislature has authorized and appropriated specific revenues to support the prayer. The amounts are tiny, compared to the size of Indiana's recent annual budget of some $25 billion in expenditures. See http://www.in.gov/sba/budget/2007_budget/as_passed/pdfs (last visited Sept. 25, 2007). The form letter cost at the time $0.54 per mailing; photographs are provided at public expense at a cost of $0.68 each; and the photographs along with a thank-you letter are sent to the cleric afterward at a cost of about $1.60 per mailing, for a total of $2.82 in direct costs. The sessions of the House are broadcast over the Internet at a cost of $112.85 an hour, or $1.88 a minute; this too is paid for by tax revenues. Assuming that a typical invocation is about 3 minutes in length, another $5.64 per legislative day might be attributed to this practice, for a total expenditure of $8.46 per prayer.

During the 2005 legislative session transcripts were prepared for 45 out of the 53 prayers that were offered. The person giving the prayer, and his or her religious affiliation, was identified for all 53 days. On 41 of those days, the prayer was offered by a cleric or other person identified with a Christian denomination; one prayer was offered by a rabbi, one by an imam, one by a lay person,

and nine by legislators. In 29 out of the 45 invocations for which transcripts are available, the person explicitly offered the prayer in the name of Jesus, Christ, the Savior, or the Son (sometimes using more than one of those words). In a small number, the officiant notes that he or she is praying personally in the name of Jesus or Christ, but in the majority, the officiant states or implies that the prayer is offered in Jesus's name by everyone assembled. The record is filled with examples, of which I offer only a few. On February 28, 2005, Rev. Radersdorf opened his prayer by saying, among other things, "Whatever you do in word or deed, do all in the name of Lord Jesus, giving thanks through Him to God the Father." On April 5, 2005, Rev. Brown first expressed thanks to the Father "for our Lord and Savior Jesus Christ," and then, at the Speaker's invitation, returned to the Speaker's stand after the Pledge and sang "Just a Little Talk with Jesus," while some legislators stood, clapped, and sang along, and others walked out of the House in protest. On April 29, 2005, Rev. Descesario said "As a minister of the gospel, I exercise my right to declare this room a hallowed place. I invite into this room, into the proceedings of the day, into the decisions that will [sic] made today, to each person, the mighty Holy Spirit of God. Holy Spirit, give these here the mind of Christ. . . . I ask this in the name of Jesus Christ."

These were the practices to which the plaintiffs, all Indiana taxpayers, objected. They filed the present suit, claiming that the Indiana legislature was appropriating and spending monies to support religion and sectarian prayer, and that this practice violated the Establishment Clause. The district court found that they had standing to sue, under *Flast v. Cohen*, and that the particular prayers the Speaker was permitting crossed the line

between permissible invocation and prohibited religious practice first established in *Marsh v. Chambers*, 463 U.S. 783 (1983). It issued an injunction, and the defendants appealed under 28 U.S.C. § 1292(a)(1). My colleagues have concluded that this lawsuit must be cut off at the threshold issue of standing. While I do not agree with them on this point, before turning to that question I wish to highlight the implications (or lack thereof) of their decision. Nothing in the majority opinion should be understood as a ruling one way or the other on the merits of the House's procedures. Should someone come along who meets the majority's concept of standing, the question whether the House may sponsor prayers at State expense urging everyone in the chamber to adhere to Christianity, or edicts declaring the room a "hallowed place," or musical exhortations, revival-style, to "talk with Jesus," is an open one.

## II

As I noted earlier, the Supreme Court has recognized three elements of Article III standing: injury-in-fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision. *Lujan*, 504 U.S. at 560-61. Whether the restrictions on taxpayer standing derive from one or more of these basic Article III constraints or if they stem from a rule of self-restraint has been unclear, see *Winkler*, 481 F.3d at 980 (majority opinion); *id.* at 988 (Sykes, J., dissenting). Because no one Justice spoke for a majority of the Supreme Court in *Freedom From Religion*, the question may still be debatable. Nonetheless, both because it is fair to assume that Justices Scalia and Thomas would agree with the three for whom Justice Alito wrote, and because Justice Alito relied squarely on Article III in his rejection of taxpayer

standing in that case, I assume for the sake of argument that we are dealing with a restriction on standing that is grounded in the Constitution.

Although it is a bit anachronistic to superimpose the *Lujan* analysis on earlier taxpayer standing cases, it is nonetheless useful for purposes of understanding how those decisions contribute to the modern law of standing. When one looks at all of the cases in this line, up to and including *Freedom From Religion*, it appears that the crucial element that is lacking in unsuccessful taxpayer suits is injury-in-fact. The Supreme Court's language in *Frothingham v. Mellon*, 262 U.S. 447 (1923), which turned away a taxpayer's effort to challenge the Maternity Act of 1921 as beyond Congress's Article I powers and an affront to the states' Tenth Amendment reserved powers, is typical. There the Court wrote that the interest of a single taxpayer

> in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

*Id.* at 487. Such an attenuated injury led inexorably to the unavailability of any useful remedy in *Frothingham* itself.

In *Flast*, the Court took a closer look at why taxpayer standing had been rejected in *Frothingham.* It concluded that the taxpayer in the latter case "lacked standing because her constitutional attack was not based on an allegation that Congress, in enacting the Maternity Act of 1921, had breached a specific limitation upon its taxing

and spending power." 392 U.S. at 105. In essence, the Court continued, she was trying "to assert the States' interest in their legislative prerogatives and not a federal taxpayer's interest in being free of taxing and spending in contravention of specific constitutional limitations imposed upon Congress' taxing and spending power." *Id.* The Establishment Clause, it then held, is such a specific limitation on the taxing and spending power, and taxpayers have "a clear stake" in assuring that Congress does not breach those limits. *Id.* The injury-in-fact that the taxpayer suffers is not the fact that he or she must pay taxes; it is the fact that those taxes are being "extracted and spent in violation of specific constitutional protections against such abuses of legislative power." So characterized, the injury is both caused by the constitutional violation and it is eminently redressable: all the court needs to do is to enjoin the unconstitutional expenditure, and then leave it to the legislature to decide whether to use the money in other, constitutional, ways or to reduce taxes.

Although some might object to the vagueness of this injury—Justice Scalia, for one, made exactly that argument in *Freedom From Religion*, see 127 S.Ct. at 2573, 2575-77—the Court has recognized injuries no more specific than this in other contexts. Thus, for example, in *Sierra Club v. Morton*, 405 U.S. 727 (1972), the Court held that users of Sequoia National Park would have had standing to challenge the construction of an elaborate ski resort, based only on the aesthetic injury they would suffer from the adverse effects on the scenery, natural and historic objects, and wildlife of the park. 405 U.S. at 734-35. Similarly, in *Heckler v. Mathews*, 465 U.S. 728 (1984), the Court held that regardless of whether a plaintiff might recover tangible monetary relief from a suit challenging unconstitu-

tional discrimination, "discrimination by itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored groups as innately inferior and therefore less worthy participants in the political community . . . can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Id.* at 739-40 (internal quotations and citations omitted). Further, in *Lujan* itself, the injury complained of was an increased "rate of extinction of endangered and threatened species." *Lujan*, 504 U.S. at 563. The shortcoming in that case was that the plaintiffs did not show how it affected them directly, even, as the concurrence by Justice Kennedy pointed out, through something as minimal as the detriment of buying plane tickets to see the disappearing animals. *Id.* at 579 (Kennedy, J., concurring); see also *Japan Whaling Assn. v. American Cetacean Society*, 478 U.S. 221, 231 n.4 (1986) ("Respondents . . . undoubtedly have alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting.").

The Establishment Clause uniquely involves this sort of psychic, aesthetic, or intangible injury. The injury involved is never physical and only rarely (with the prominent exception of taxpayer cases, it so happens) even monetary. Instead, in cases where the Court has not balked at accepting standing, the plaintiffs claim more intangible injuries such as: having a predominantly religious purpose in arranging art in a particular way, see *McCreary County v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 881 (2005); passing a monument along one's path to work, see *Van Orden v. Perry*, 545 U.S. 677, 694 (2005) (Thomas, J., concurring) (reaching the merits of the

Establishment Clause injury; not questioning standing); or sending a message of endorsement or disapproval of religion, see *Lynch v. Donnelly*, 465 U.S. 668, 687-88 (1984) (O'Connor, J., concurring). Were they attached to another clause in the Constitution, these harms conceivably might be too amorphous for the courts to find standing; in the Establishment Clause context, however, standing was clear. See, *e.g.*, *DaimlerChrysler Corp. v. Cuno*, 126 S.Ct. 1854, 1859 (2006) (Commerce Clause); *Valley Forge v. Americans United for the Separation of Church and State, Inc., et al.*, 454 U.S. 464, 466 (1982) (art. IV, § 3, cl. 2); *Frothingham v. Mellon*, 262 U.S. 447 (1923) (amends. V and X). Indeed, viewed against the backdrop of other injuries in Establishment Clause cases, the plaintiffs here have shown more concrete damage than most: they have enumerated, with some degree of accuracy, the value of the "three pence" they pay to support the practices of which they complain. See *Daimler-Chrysler*, 126 S.Ct. at 1864, quoting from *Flast*, 392 U.S. at 102, which in turn was quoting 2 *Writings of James Madison* 186 (G. Hunt ed. 1901). This harm is more concrete than injuries arising from a Ten Commandments display, a holiday creche, or a graduation prayer, all of which are staples of Establishment Clause jurisprudence. By the standards set in other Establishment Clause cases, anybody who has heard one of these prayers (in person or on the web) should be able to claim standing at least to have her claim heard, whether or not it eventually succeeds. See *American Civil Liberties Union v. St. Charles*, 794 F.2d 265, 274-75 (7th Cir. 1986) (arguing that Establishment Clause standing would exist when a citizen saw a $20 creche or had to alter her path on the sidewalk, but not when she read about the creche in the newspaper). Potential injury to the plaintiffs before us—in their role as constituents, which they necessarily are if they are taxpayers—is even ex-

pressly considered and warned against in the letter sent to Ministers of the Day, asking that they "strive to be ecumenical"; the caution is presumably there to avoid inadvertently excluding or offending a constituent from a "different faith background." Categorizing this foreseen, concrete harm as an "amorphous burden" that does not give rise to a cognizable case or controversy, see *ante* at 30 n.7, gives insufficient weight to the nature of the harm inherent in all Establishment Clause cases.

In evaluating the case before us, it is not necessary to review all of the cases dealing with taxpayer standing to challenge either Establishment Clause violations or other constitutional violations. It is enough to take a closer look at *Freedom From Religion* and to note carefully what the plurality did and did not hold there. Before doing so, I note one point of agreement between the majority and me: the principles announced in *Freedom From Religion* with respect to federal taxpayers apply with equal force to the state taxpayers before us in the present case. The Supreme Court so held in *DaimlerChrysler*, 126 S.Ct. at 1863, which was a case in which state taxpayers claimed that certain tax benefits afforded by Ohio law violated the Commerce Clause. The Court concluded that it could not reach the substantive Commerce Clause issue, because the state taxpayers lacked standing to sue in federal court. In so holding, however, the Court distinguished between the Establishment Clause challenge that *Flast* permitted and the Commerce Clause challenge the plaintiffs were trying to press: "Whatever rights plaintiffs have under the Commerce Clause, they are fundamentally unlike the right not to 'contribute three pence . . . for the support of any one [religious] establishment.' " *Id.* at 1864, quoting from *Flast*, 392 U.S. at 102, in turn quoting 2 *Writings of James Madison* 186.

I have been discussing Justice Alito's plurality opinion reversing the court of appeals, as does the majority, because it was he who expressed the middle ground on the Court. Unlike Justices Scalia and Thomas, who thought that the time had come to overrule *Flast*, Justice Alito, joined by the Chief Justice and Justice Kennedy, was not prepared to go so far. The plurality found such a move unnecessary, because in their view the taxpayers before them did not satisfy *Flast*'s narrow exception to the normal *Frothingham* rule against taxpayer standing. Justice Souter, writing for himself and the other three dissenters, noted the Court in *DaimlerChrysler* had recently reaffirmed that the " ' "injury" alleged in Establishment Clause challenges to federal spending' is 'the very "extract[ion] and spend[ing]" of "tax money" in aid of religion.' " 127 S.Ct. at 2584-85, quoting *DaimlerChrysler*, 126 S.Ct. at 1865. The reason why the Alito plurality thought that the *Flast* rule did not apply to the plaintiffs in *Freedom From Religion* was simple: the plaintiffs were not challenging legislative actions; instead, they were attacking Executive Branch expenditures in support of religion (in particular, the White House Office of Faith-Based and Community Initiatives within the Executive Office of the President, and related Executive Centers in other federal agencies and departments). While the dissenters took the plurality to task for that distinction, arguing that the Judicial Branch has no reason to distinguish between actions of the Executive Branch and those of the Legislative Branch, theirs was not the prevailing voice.

The plurality opinion contains numerous references to the importance of the fact that "[t]he expenditures at issue in *Flast* were made pursuant to an express congressional mandate and a specific congressional appropriation." 127

S.Ct. at 2565. In the case before the Court, in contrast, "[r]espondents [did] not challenge any specific congressional action or appropriation; nor [did] they ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional." *Id.* at 2566. Allowing taxpayers to challenge general Executive programs on an "as applied" basis would, the plurality feared, stretch the nexus between the status as taxpayer and the program beyond the breaking point. Justice Alito continued, "[i]t cannot be that every legal challenge to a discretionary Executive Branch action implicates the constitutionality of the underlying congressional appropriation." *Id.* at 2567-68. He concluded this part of the opinion as follows:

> Because the expenditures that respondents challenge were not expressly authorized or mandated by any specific congressional enactment, respondents' lawsuit is not directed at an exercise of congressional power, see *Valley Forge*, 454 U.S. at 479, and thus lacks the requisite "logical nexus" between taxpayer status "and the type of legislative enactment attacked." *Flast*, 392 U.S. at 102.

*Id.* at 2568. Finally, Justice Alito rejected the "parade of horribles" that respondents feared would occur if discretionary Executive Branch expenditures were outside the reach of taxpayer litigation. "In the unlikely event that any of these [overtly religious] actions did take place, Congress could quickly step in." *Id.* at 2571.

## III

Given the fact that taxpayer standing, after *Freedom From Religion*, turns on whether the plaintiffs are claiming that a "legislatively created program" is unconstitutional

because it violates the Establishment Clause, we must look more specifically at what our plaintiffs are attempting to challenge to see whether this suit may go forward to an adjudication on the merits. What we find is a challenge to a *legislative* chaplaincy, created by a House Rule enacted by Indiana's House of Representatives and administered by the Speaker. The Indiana House and Senate both enact their rules pursuant to Ind. Const. art. IV, § 10 ("*Each House, when assembled, shall* choose its own officers, the President of the Senate excepted; judge the elections, qualifications, and returns of its own members; *determine its rules of proceeding*, and sit upon its own adjournment. But neither House shall, without the consent of the other, adjourn for more than three days, nor to any place other than that in which it may be sitting.") (emphasis added). There does not appear to be any additional specific enabling act pursuant to which the rules are adopted at the beginning of each session. This seems close to the practice of the U.S. Senate, which maintains standing rules rather than readopting them at the beginning of each session. See Sen. Rule V.2 ("The rules of the Senate shall continue from one Congress to the next Congress . . . .").

Under *Freedom From Religion*, it is necessary to situate these rules, and House Rule 10.2 in particular, somewhere in the broader scheme of Indiana's government. In the final analysis they necessarily must be legislative acts, executive acts, or something sufficiently like one of those two that we can proceed with the standing analysis. (They certainly are not judicial in nature, which is why I disregard that possibility.) This is not the usual question that comes up, in the administrative law context, with respect to legislative rules. Instead, courts have grappled with whether challenges to this type of internal rule present

nonjusticiable political questions for the reason that there is an explicit textual commitment to each house to set its own rules. See U.S. Const. art. I, § 5, cl. 2; Ind. Const. art. IV, § 10. But, interestingly, there is a qualification to the political question doctrine for cases in which the internal rules "transgress[] identifiable textual limits," *Nixon v. United States*, 506 U.S. 224, 238 (1993). Under *Nixon*, internal rules give way to constitutional text but are otherwise generally unreviewable. *Id.* at 237-38; *cf. Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) (holding that an enrolled bill is conclusive evidence of its validity; refusing to evaluate the process or rules by which it reached that point). So we are back to the same question: if a House rule violates the Establishment Clause, which looks like an identifiable textual limit on federal lawmaking authority, and state authority through incorporation by the Fourteenth Amendment, is it the kind of legislative enactment that would support taxpayer standing?

There is no indication anywhere that a rule like House Rule 10.2 is anything other than legislative. Indeed, the Indiana courts have made it clear that the powers of the two houses of its Legislative Branch are themselves solely legislative in nature; neither the executive nor the judicial branches of government may interfere with them. See, *e.g.*, *State ex rel. Wheeler v. Shelby Circuit Court*, 362 N.E.2d 477 (Ind. 1977), on rehearing 369 N.E.2d 933 (Ind. 1977); *State ex rel. Batchelet v. Dekalb Circuit Court*, 229 N.E.2d 798 (Ind. 1967); *State ex rel. Acker v. Reeves*, 95 N.E.2d 838 (Ind. 1951). Both the majority and the United States, as *amicus curiae*, argue that it is proper to characterize the rules as non-legislative because they address an internal legislative matter, rather than a public act of the legislature. (Indirectly, perhaps, the majority and *amicus* are returning

to the political question argument. The existence of a possible political question, however, does not defeat standing to sue; it presents a different reason why a court might not adjudicate a case.) In any event, this argument misses the key issue animating *Freedom From Religion*: Justice Alito's rationale was founded on the fact that the expenditure was not only executive but discretionary—two steps removed from any legislative action. The majority in our case bases its argument on the fact that there is no specific line item reading "Chaplain—Minister of the Day Program" in the *budget*. But that begs the question. The budget is not the only legislative act before us. There is also House Rule 10.2, which specifically calls for the prayer, and the prayer is concretely supported by the appropriations the General Assembly makes for the House in the budget. Far from being twice-removed from a legislative action, as was the case in *Freedom From Religion*, the challenge before us is ratified twice by the legislature, once as a rule and the second time in the budget. It is unquestionably a legislative act.

The House Prayer is thus different from the Bible readings at issue in *Doremus v. Board of Ed. of Hawthorne*, 342 U.S. 429 (1952)—a case that in any event pre-dated *Flast* and thus may have been qualified by the later decision. Although the readings from the Old Testament with which public school teachers were to begin the school day were required by a New Jersey statute, they were conducted under the broader umbrella of the state's school program. The Court saw no "pocketbook" angle to the case, 342 U.S. at 434, but only "a religious difference." *Id.* It then commented that "[i]f appellants established the requisite special injury necessary to a taxpayer's case or controversy, it would not matter that their dominant

inducement to action was more religious than mercenary." *Id.* at 434-35. The real problem for the taxpayer-plaintiffs in *Doremus,* therefore, was a failure of proof of any pocket-book consequence; plaintiffs here, in contrast, have taken pains to spell out the financial implications of the House Prayer. To reiterate, there is a line item for "House Expenses," and doubtless the accounts into which that appropriation is put are the ones drawn down to pay for the Minister of the Day program. *Flast* requires a nexus between taxpayer status (paying into the fisc) and the type of legislative action enacted (the budget item for "House Expenses," from which these expenditures are made, and Rule 10.2, in furtherance of which these expenditures are made).

The majority would require litigants to trace money directly through the state's accounts, which is surely an excessive requirement for a preliminary matter like standing. This reading of *Freedom From Religion* would effectively adopt Justice Scalia's concurring opinion for himself and Justice Thomas advocating the overruling of *Flast*, in contravention of the rule in *Marks v. United States*, 430 U.S. 188 (1977), which held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " *Id.* at 193 (citation omitted). It would become impossible to bring a taxpayer suit for anything short of an unimaginably stupid or insensitive legislative action—perhaps a law announcing that Indiana is a Christian state—which in any event would be unlikely to inflict specific enough harm on any one person to allow him or her to sue for more particular injuries.

The majority's approach also disregards the special place that legislative chaplaincies have held in the Supreme Court's Establishment Clause and standing jurisprudence. *Marsh v. Chambers* was decided in 1983, long after both *Doremus* and *Flast* were on the books. In that case, the Court considered a challenge to the practice of the Nebraska legislature of opening each legislative day with a prayer by a chaplain paid by the state. 463 U.S. at 784. The plaintiff, Ernest Chambers, sued both in his capacity as a member of the Nebraska legislature and in his capacity as a taxpayer of Nebraska. The Supreme Court noted that the court of appeals had considered, among other things, the question of standing, *id.* at 785, but it moved directly to the merits—something it could not have done, given the jurisdictional nature of an Article III challenge, had it thought that there was a problem with standing. On the merits, the Court found no problem with the chaplaincy that Nebraska had adopted. It noted in passing that the chaplain had characterized his prayers as " 'nonsectarian,' 'Judeo Christian,' and with 'elements of the American civil religion.' " *Id.* at 793 n.14. It also noted that "[a]lthough some of his earlier prayers were often explicitly Christian, [the chaplain] removed all references to Christ after a 1980 complaint from a Jewish legislator." *Id.* These, of course, are merits judgments.

I do not rule out the possibility that some or all of the prayers offered before the Indiana House might similarly pass muster under *Marsh.* Unfortunately, however, we are never to find out. Under the majority's approach, even if the Speaker decides to start working his way through the Anglican Book of Common Prayer day by day, notwithstanding the presence of Jewish, Muslim, Hindu, Buddhist, and other legislators, staff, and con-

stituents, nothing can be done to enforce the command of
the Establishment Clause. As long as a majority of the
House is Christian, it is also reasonable to predict that
the House itself will never take action to curb such a
practice.

Apart from all the other problems I see with this out-
come, it is striking how inconsistent it is with the history
of the Establishment Clause. A leading casebook on the
subject summarized the type of "establishment of religion"
that was known to the Framers of the Constitution as
including four prominent features: (1) governmental
control over church doctrine and personnel; (2) suppres-
sion of alternative faiths; (3) political connections between
the established church and the lay government; and
(4) compelled attendance and financial support for the
established church. Michael W. McConnell, John H.
Garvey, and Thomas C. Berg, *Religion and the Constitution*
21-23 (Aspen 2002). To illustrate the sort of state establish-
ments that persisted after the Constitution was written,
the book presents the case of *Barnes v. First Parish in
Falmouth*, 6 Mass. 400, 1810 WL 938 (1810), which dealt
with the question whether a public school teacher af-
filiated with a sect of Christianity different from that of the
majority in his area could recover taxes paid over to the
majority church. In rejecting his case, the court had this
to say:

> Having secured liberty of conscience, on the subject of
> religious opinion and worship, for every man, whether
> Protestant or Catholic, Jew, Mahometan, or Pagan, the
> constitution then provides for the public teaching of
> the precepts and maxims of the religion, of Protestant
> Christians to all the people. And for this purpose it is
> made the right and the duty of all corporate religious

> societies, to elect and support a public Protestant teacher of piety, religion, and morality; and the election and support of the teacher depend exclusively on the will of a majority of each society incorporated for those purposes.

1810 WL 938 at *4. This case arose long before the enactment of the Fourteenth Amendment, obviously, and thus long before the Establishment Clause operated as a direct restraint on state law. Furthermore, Massachusetts itself dismantled its established religion in 1833. See McConnell *et al.*, *Religion and the Constitution* at 35. The element of using taxes as support for religious efforts, however, was a clear feature of the Massachusetts establishment while it persisted.

Professor Philip Hamburger provides further insight into the evils that the Establishment Clause was designed to address:

> In late eighteenth-century America the dissenters from the established churches sought limitations on civil government and did so in arguments that conformed to recognizable patterns. The states with establishments had once passed laws imposing penalties on dissenters but now more typically enacted only privileges for their established denominations— notably, salaries for the established clergy. Against these establishments of religion most dissenters sought not only a freedom from penalties (whether in terms of the "freedom of worship" or the "free exercise of religion") but also guarantees against the unequal distribution of government salaries and other benefits on account of differences in religious beliefs. Some dissenters even demanded assurances that there would not be any civil law taking "cognizance" of

> religion. As a result, the American constitutions that were drafted to accommodate the antiestablishment demands of dissenters guaranteed religious liberty in terms of these limitations on government—specifically, limits on discrimination by civil laws and on the subject matter of civil laws.

Phillip Hamburger, *Separation of Church and State* 11-12 (Harvard University 2002). Madison agreed with the dissenters who thought that the state should not establish a religion; indeed he may have favored a more absolute separation between "matters of Religion" and "Civil Society." *Id.* at 105. When it came to drafting the Bill of Rights, however, he settled on antiestablishment language similar to that which was finally adopted. *Id.* This suggests that the Establishment Clause was the result of efforts by religious dissenters who felt the need to protect themselves from the dominant established sects that had managed to secure various benefits that could be conferred only by the state, including access to the public fisc.

In my view, the taxpayer-plaintiffs before us have alleged enough to win the right to present their challenge to the House Prayer before a judicial forum. They are challenging a legislative act, and they have alleged concrete pocketbook injuries. Given both the ruling in *Marsh* and the qualifications on that ruling, the issue they wish to present is a serious one. They argue, in essence, that preferential access to the Speaker's stand for adherents to the Christian faith is exactly the kind of problem that the First Amendment's Establishment Clause was supposed to remedy. Were this a simple Establishment Clause case in which they complained about hearing the prayers as they walked past the door of the House Chamber on their usual way to work, they may very well have been entitled

to proceed. The majority overextends the command of *Freedom From Religion* in denying them a day in court. I respectfully dissent.

A true Copy:

       Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
